Jimmie FIELDS, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 12–93–00283–CR.

Court of Appeals of Texas,
Tyler.

March 31, 1996.

Discretionary Review Refused
Sept. 18, 1996.

Robert A. Montserrat, Dallas, for appellant.

Frank Long, Sulphur Springs, for appellee.

RAMEY, Chief Justice.

A jury convicted Jimmie Fields, Jr., ("Fields") of the offense of aggravated possession of more than 400 grams of cocaine. The jury assessed punishment at life imprisonment and a $100,000 fine. Fields appeals, raising eleven points of error. We will affirm.

Fields' sixth point of error challenges the legal sufficiency of the evidence to support his conviction, and we will address that point first. Fields asserts that the evidence was insufficient because the State did not prove that he exercised care, custody, control or management over the cocaine found in the vehicle he was occupying, nor that he knew that the substance was cocaine.

Trooper Bruce Roberts ("Roberts"), a 19 year veteran with the Texas Department of Public Safety ("DPS"), testified that on the afternoon of March 15, 1993, as he entered the ramp onto Interstate 30 ("I–30"), a beige/gold Lincoln Continental Towncar passed him at a high rate of speed. Roberts, who was driving his DPS vehicle and accompanied by citizen observers Frank Bell and his niece, pursued the Lincoln. He clocked it at 61 miles per hour in a 50 mile per hour zone where construction was in progress. Once through the construction area, Roberts activated his overhead flashing lights and signalled the Lincoln to stop, which it did. As Roberts exited his vehicle, he noticed that

the Lincoln bore an Avis rental car sticker and that there were two people in the vehicle. Roberts approached the driver, later identified as Larry Johnson ("Johnson"), and asked to see his driver's license; instead, Johnson handed him a "Malibu Gran Prix" racing license. When Roberts asked him if he had a valid driver's license, Johnson appeared nervous, moved his head around a lot, and stated that he had one but he was not sure where it was. Johnson then conducted a cursory search between the seats and reached for the glove box, explaining that he was looking for his license. As Roberts waited, he noted that there was no luggage in the car's interior. Unable to find his license in the glove box, Johnson began to look for it in the trunk. Roberts accompanied him to the rear of the car. Upon opening the trunk, Roberts observed three items: a small sports bag, a garment bag, and a pair of silver-tipped boots. Johnson then began rifling through the sports bag. With regard to Johnson's search of the first bag, Roberts testified: "Again, he was looking in it real rapidly. I don't see how he could have found anything if it was in there. He went through it real fast." Next, Johnson opened the garment bag which he stated belonged to the passenger, Fields. When Roberts asked him why his license would be in the passenger's garment bag, Johnson grew visibly more nervous.

Johnson never found his license, so at Roberts' request, Bell, who had accompanied Roberts, took down Johnson's correct name and date of birth. Roberts testified, however, that because Johnson was so nervous and stuttering so badly, it took Roberts quite awhile to get Johnson's correct name and date of birth from him. Roberts stated that it was obvious to him that something was wrong. When asked from where they had been travelling, Johnson informed Roberts that they had been in Grand Prairie, Texas, for five days helping Johnson's uncle level a house. Roberts then approached Fields who produced a Tennessee Driver's License correctly identifying him as Jimmie Fields, Jr. When asked, Fields informed Roberts that his girlfriend had rented the Lincoln for them.

After talking with Fields, Roberts returned to his patrol vehicle to run computerized driver's license and criminal history checks on both men. From these inquiries, Roberts learned that Fields' driver's license had been suspended; consequently, he called for back up assistance and placed Johnson under arrest for driving while license suspended. Shortly thereafter, Trooper Jeff Maeker arrived, and Roberts informed him that he believed the occupants were transporting drugs in the Lincoln. Roberts explained to Maeker that Johnson had been acting extremely nervous, was shifting his weight from one side to the other, and would not look at him. Roberts stated, however, that Johnson said there were no drugs in the Lincoln and that they could search the car if they wanted to.

Roberts then informed Fields as to why they had arrested Johnson. He also asked Fields where they had been. Fields told Roberts that they had been in Grand Prairie looking for a site for his home. He then attempted to show Roberts a set of plans. When asked if there were any drugs in the car, Fields replied "no" and invited Roberts to search the Lincoln. When further back-up support arrived, Roberts informed Fields and Johnson that he suspected that they were carrying drugs, and they would take the Lincoln to the Hopkins County's Sheriff's Office to search it. Neither suspect protested.

Bell then drove the Lincoln to the Sheriff's office where he and Trooper Boggs stayed with the vehicle while Roberts went with the vehicle occupants inside the office. While Roberts was inside, he was notified by another officer that drugs had been found under the hood of the Lincoln. Roberts then went into the sally port, where he was handed a bag that had been removed from the hood of the vehicle and which contained State's exhibits 1–A, 1–B and 1–C. At trial, Roberts identified State's exhibit 2 as the same bag that had been removed from the Lincoln on March 15, 1993. Roberts also identified State's several exhibits as items found inside the Lincoln during an inventory search.

Exhibit 13, a container of air freshener, was identified as an item Roberts found un-

der the seat of the car the day following the arrests. With regard to that exhibit, Roberts testified that because the Lincoln was to be picked up by the rental company, he had to determine that all of the parties' belongings had been retrieved from the vehicle. These items consisted of two beepers—one of which may not have been in Roberts' possession—two pagers which he already had in his possession, a radar detector, luggage and a pair of boots. He further stated that in checking the vehicle's interior, he found the container of air freshener under the passenger's seat which had been occupied by Fields and which had not been listed on the vehicle inventory form. Roberts thus testified that he retrieved the air freshener and possibly one of two beepers that had been listed on the inventory along with the parties' luggage and boots. Roberts stated that because the duffle bag of drugs found under the hood had emitted a strong perfume smell, he deduced that the air freshener was the scent used to mask the drugs' odor and was thus evidence in the case.

On cross-examination, Roberts testified that neither scales nor other drug paraphernalia was found in the Lincoln, and neither suspect attempted to escape. Moreover, he testified that while Johnson was shaking quite a bit, it was cold and misty outside while he was questioning the occupants.

Frank Bell, a citizen who often rode with Roberts on patrol, testified that after the arrest, at Roberts' direction, he drove the Lincoln to the sally port of the Hopkins County Jail. Bell testified that he neither put anything in nor took anything out of the Lincoln, but he stated that he was present when the drugs were found under the hood of the Lincoln.

Ricky Jones, the canine narcotics officer for the Franklin County Sheriff, testified that on March 15, 1993, the Hopkins County Sheriff's office requested his assistance. In response to that request, he and Marko, the narcotics detection dog under his supervision, went to the Hopkins County Sheriff's department. Upon their arrival, they were directed to the sally port to conduct a narcotics search on a 1990 Lincoln. Marko, who is trained to detect the odor of marijuana and cocaine,

"alerted" on the Lincoln at the area between the front tire and fender. In response to the dog's reaction, Jones opened the Lincoln's hood and discovered a purple duffle bag, which had been placed on top of the engine. Inside the duffle bag were two white towels, three packages of a substance and then another towel between them. Jones took the bag into his custody, borrowed a knife and stuck it into one of the packages. When he extracted the knife, it was covered with a white powdery residue. Several pictures of the packages and duffle bag were taken. Then Jones and another officer took the packages into the Sheriff's office, weighed each and marked its weight on the outside of the package. He then returned the packages to the container and took more photographs. Afterwards, Jones placed the packages in Roberts' custody. Following this testimony, Jones identified State's exhibits 1–A, 1–B, and 1–C as the packages he had removed from the purple duffle bag.

Following Jones' testimony, Karen Shumate, a chemist with the Texas DPS Crime Lab in Tyler, Texas, identified State's exhibits 1–A, 1–B, and 1–C as the exhibits she received from Bruce Roberts. Shumate testified that after receiving the exhibits, she tested and weighed them, and their combined weight was 3.00 kilograms or 6.6 pounds. Shumate further testified that the three exhibits contained 81 percent pure cocaine.

As its next witness, the State called Keith Allen, a lieutenant with the DPS narcotics service. Allen testified that based upon his experience, 6.6 pounds of cocaine would sell for approximately $60,000 wholesale in the Northeast Texas area. He further testified that at retail prices, that amount of cocaine would sell for as much as $900,000 on the street.

Allen testified that through his work, he was familiar with the patterns and activities of people who transported narcotics. He then testified that characteristically, such people: (1) do not drive vehicles registered to them; (2) are deceptive as to their destination and the length of time they will be travelling; (3) carry an inadequate quantity of clothing for the number of occupants in the vehicle and their projected stay; (4) gen-

erally display wealth while their stated employment would not support such wealth; (5) are generally very friendly; and (6) carry electronic pagers. On cross-examination, however, Allen admitted that hundreds of thousands of people who are not drug traffickers drive rented vehicles and carry pagers. He further testified that he had no personal knowledge as to whom the cocaine in evidence here belonged. Additionally, Allen testified that drug traffickers often carry a lot of money with them.

As its last witness, the State re-called Trooper Bruce Roberts. On re-direct examination, Roberts testified that Johnson informed him that he worked as a clerk for J & S Grocery. Following Roberts' testimony, the State rested its case. Thereafter, Fields moved for an instructed verdict based upon insufficient evidence. After hearing arguments on the motion, the trial court denied the motion, and the parties closed the evidence. The case was thereafter submitted to the jury on the court's charge, which contained instructions on the law of parties.

The offense of aggravated possession of cocaine is set forth in TEX.HEALTH & SAFETY CODE § 481.115 (Vernon Supp.1993). That section provides:

(a) Except as authorized by this chapter, a person commits an offense if the person knowingly or intentionally possesses a controlled substance listed in Penalty Group 1, unless the person obtained the substance directly from or under a valid prescription or order of a practitioner acting in the course of professional practice.

. . . . .

(c) A person commits an aggravated offense if the person commits an offense under Subsection (a) and the amount of the controlled substance possessed is, by aggregate weight, including adulterants and dilutants, 28 grams or more.

(d) An offense under subsection (c) is:

. . . . .

(2) punishable by confinement in the Texas Department of Corrections for life or for a term of not more than 99 years or less than 10 years, and a fine not to exceed $100,000, if the amount of the controlled substance possessed is, by aggregate weight, including adulterants and dilutants, 400 grams or more.

Possession is defined in § 481.002(38) as meaning "actual care, custody, control or management" of the contraband.

■ In reviewing the legal sufficiency of the evidence, this Court must examine all of the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 at 320, 99 S.Ct. 2781 at 2789, 61 L.Ed.2d 560 (1979); *Jones v. State*, 833 S.W.2d 118, 122 (Tex.Cr.App.1992), *cert denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993). The standard of review is the same for both direct and circumstantial evidence, and the State need not exclude every reasonable hypothesis other than the defendant's guilt. *Geesa v. State*, 820 S.W.2d 154, 161 (Tex.Cr. App.1991).

■ In order to establish the unlawful possession of a controlled substance, the State must prove that the defendant (1) exercised care, control, or management over the contraband, and (2) knew what he possessed was contraband. *Cude v. State*, 716 S.W.2d 46, 47 (Tex.Cr.App.1986); *Hurtado v. State*, 881 S.W.2d 738, 743 (Tex.App.—Houston [1st Dist.] 1994, no pet.); *Gonzales v. State*, 809 S.W.2d 778, 780 (Tex.App.—Houston [14th Dist.] 1991, pet. ref'd). To establish Field's control and knowledge of the cocaine, the State must prove more than that he was merely in the vicinity of the controlled substance; it must provide "affirmative links" between the accused and the contraband, *i.e.,* facts and circumstances in addition to mere presence that raise a reasonable inference of the accused's knowledge and control of the contraband. *Hurtado*, 881 S.W.2d at 743. In *Gilbert v. State*, the First Court of Appeals cataloged a variety of factors that may link the accused to the contraband; these include whether the contraband: (1) was in plain view; (2) was conveniently accessible to the accused; (3) was in a place owned by

accused; (4) was in a car driven by accused; (5) was found on the same side of the car as accused; (6) was found in an enclosed space; or (7) emitted an odor. Additional links include whether: (8) paraphernalia to use the contraband was in view of or found on the accused; (9) conduct of the accused indicated a consciousness of guilt; (10) the accused had a special relationship to the contraband; (11) occupants of the automobile gave conflicting statements about relevant matters; (12) the physical condition of the accused indicated recent consumption of the contraband found in the car; and (13) affirmative statements connect the accused to the contraband. *Gilbert v. State*, 874 S.W.2d 290, 298 (Tex. App.—Houston [1st Dist.], 1994, pet ref'd).

In the instant case, the following evidence linked Appellant to the contraband: (1) inasmuch as the Lincoln had been rented by Fields' girlfriend, Bostik, Fields had had possession of the vehicle for the preceding five or more days while Fields & Johnson had been in Grand Prairie; (2) the drugs were found concealed beneath the closed hood of the Lincoln, and the hood latch was controlled from the interior of the car; (3) a can of air freshener was located under the seat occupied by Fields, and the air freshener odor matched the scent of the contraband when found; (4) Fields untruthfully denied his prior drug offenses; (5) Fields and Johnson gave conflicting stories as to their purpose for coming to Texas and activities while in Texas; (6) Fields carried an inadequate amount of clothing for a five day trip; (7) Fields exhibited unnatural equanimity and lack of concern throughout the temporary detention and the subsequent investigation.

Reviewing the evidence in the light most favorable to the verdict, we conclude that the evidence presented provided an affirmative link from which the jury could rationally find that Fields had control of the cocaine and knew the cocaine was contraband. Accordingly, we overrule point of error six.

In his first two points of error, Fields asserts that the trial court erred in overruling his motion to suppress the fruits of the search of the Lincoln Towncar driven by Johnson, in which Fields was the only other occupant. In point one, Fields contends that there were no facts justifying an investigatory detention of Fields or his arrest. In his second point, Fields asserts that Trooper Bruce Roberts ("Roberts") exceeded the search consent that Fields gave him.

At the suppression hearing that preceded the commencement of the guilt/innocence phase of the trial, only Roberts was called as a witness. His testimony at the suppression hearing tracked his subsequent testimony at the guilt/innocence phase of the trial as previously described.

In our consideration of these points, we must view the evidence offered at the suppression hearing in the light most favorable to the trial court's ruling. *Laca v. State*, 893 S.W.2d 171, 176 (Tex.App.—El Paso 1995, pet. ref'd). The trial judge is the sole and exclusive factfinder at a hearing on a motion to suppress. *Romero v. State*, 800 S.W.2d 539 (Tex.Cr.App.1990). On appeal, we do not engage in our own factual review but decide whether the trial court's fact findings are supported by the record. *Laca*, 893 S.W.2d at 177. If the findings are so supported, we are not at liberty to disturb the court's findings, and, on review, we address only the question of whether the trial court improperly applied the law to the facts. *Romero*, 800 S.W.2d at 543. The totality of the circumstances must be considered in determining whether the trial court's findings are supported by the record, and those findings will not be disturbed absent a clear abuse of discretion. *Dancy v. State*, 728 S.W.2d 772, 777 (Tex.Cr.App.1987), *cert. denied*, 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987). If the trial court's decision is correct on any applicable theory of law, it will be sustained. *Romero*, 800 S.W.2d at 543.

Johnson was arrested; he was charged with driving the Lincoln with a suspended driver's license. Fields was not removed, nor did he alight from the Lincoln until Roberts advised him after the consent to search was granted that the search of the automobile would be performed at the Sheriff's office. Other than the movement of the Lincoln for the search, to which Fields did not object, Fields' liberty or movement was

not restricted or restrained; thus there was no arrest. *Amores v. State,* 816 S.W.2d 407, 411 (Tex.Cr.App.1991). Fields was handcuffed for the purpose of transporting him in the DPS vehicle to the Sheriff's office in accordance with department policy. Fields was arrested only after the discovery of the large quantity of contraband under the hood of the Lincoln. There is no dispute in the record that this handcuffing procedure was required by departmental policy while Fields was in transit in the DPS vehicle.

 Fields complains of the initial stop. The Lincoln had been stopped for the offense of speeding. Most of Roberts' post-stop conversation involved the car's driver, Johnson. Law enforcement officers are permitted to ask questions of citizens. *Daniels v. State,* 718 S.W.2d 702, 704 (Tex.Cr.App. 1986), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 252 (1986), *overruled on other grounds, Juarez v. State,* 758 S.W.2d 772, 780 (Tex.Cr.App.1988). If Roberts' questioning resulted in the detention of Fields, it must have been supported by reasonable suspicion. *Terry v. Ohio,* 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). This reasonable suspicion must be based upon articulable facts suggesting that criminal activity may be taking place. In other words, there must be some level of objective justification for making the stop beyond a mere "hunch." *Howe v. State,* 874 S.W.2d 895, 900 (Tex.App.—Austin 1994, no pet.). Here, the excessive speed of the car, the apparent extreme nervousness of the driver, his suspended license, Fields' apparent possession of the vehicle (Fields stated that the overdue rental of the vehicle was to his absent girlfriend, Bostik), Roberts' knowledge that (despite Fields' initial denial) Fields had a history of drug offenses, the travellers' inconsistent versions of their recent activities, and the total circumstances surrounding the vehicle support the less demanding level of suspicion required for a temporary detention and the abbreviated inquiries of Fields. Fields' first point is overruled.

 As to whether Roberts exceeded the alleged consent to search, the record reflects that Fields' consent followed his denial that

there were any drugs in the Lincoln. It appears that Roberts had informed Fields and Johnson that he suspected that there were drugs in the Lincoln. Fields' oral consent to the search was voluntary, not requested by Roberts. In a separate conversation, Johnson also offered his consent to search the Lincoln for drugs. No DPS written consent form was executed by either occupant. Roberts decided to move the Lincoln to the Sheriff's office for the search because the stop had been made on an interstate highway in a construction area and the weather was inclement. Neither Fields nor Johnson objected to the movement of their vehicle or the place or nature of the search. No limitation upon the search was expressed. Fields' second point of error is overruled.

 In his third point of error, Fields complains that the trial court erred in denying his requested jury charge pursuant to Article 38.23 of the Tex.Code Crim.Proc., which prohibits the admission of any evidence obtained in violation of the accused's rights and requires that:

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Where a reasonable suspicion arises from articulable facts, an officer is permitted to make a temporary investigation detention. *Stone v. State,* 703 S.W.2d 652, 654–55 (Tex. Cr.App.1986). Where the facts relied upon by the State are uncontroverted, their sufficiency is a question of law for the court. *Rose v. State,* 470 S.W.2d 198, 200 (Tex.Cr. App.1971).

 Fields offered no proof in the case; therefore, though he objected at the suppression hearing to the search and seizure, he offered no proof that any of the State's evidence was obtained in violation of his rights. Neither did the cross-examination of the State's witness raise a fact issue or call into question the validity of the detention or the consent to the search and seizure of evidence. Fields did not present any evidence

to challenge the State's assertion that the Lincoln was speeding, that Johnson's license was suspended, that the vehicle was rented by a third party, Fields' girlfriend, which rental agreement had expired, that Fields had a criminal history of drug transactions, or that both Fields and Johnson consented to the search.

The trial court is required by Article 38.23 to instruct the jury to disregard any evidence illegally obtained when there is a fact issue as to the legality of the search and seizure. *Brooks v. State,* 642 S.W.2d 791, 799 (Tex.Cr.App.1982); *Moreno v. State,* 916 S.W.2d 654 (Tex.App.—El Paso 1996, no pet. h.). Here there is no such question presented by the evidence. Absent some controversion of some of the critical evidence, the ruling of the trial court is sustained. Fields' third point of error is overruled.

By his fourth point of error, Fields alleges that the trial court erred in admitting into evidence over his objection the can of air freshener found in the Lincoln because Trooper Roberts did not inadvertently find this evidence but intentionally went looking for it. Fields claims that because Roberts returned to search the car again 24 hours after it had originally been inventoried and searched, and without a warrant or probable cause, both the search of the vehicle and the seizure of the air freshener were unreasonable under the Fourth Amendment.

As his sole authority for this position, Fields cites *Arizona v. Hicks,* 480 U.S. 321, 323–24, 107 S.Ct. 1149, 1151–52, 94 L.Ed.2d 347 (1987). In *Hicks,* an officer seized stolen stereo equipment found in an apartment during an investigation related to a shot fired from that apartment. The court held that the seizure of the stereo equipment, being unrelated to the shooting crime under investigation, was an unlawful seizure. In so holding, the court noted that before the plain view doctrine can be invoked, there must be probable cause to believe that the item in question is evidence of a crime.

The State, in turn, argues that this was not an unlawful search of the vehicle and that the plain view doctrine was designed to allow the seizure of evidence in this type of scenario. Citing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) and *White v. State,* 729 S.W.2d 737, 739 (Tex.Cr.App.1987), the State sets forth the following three factors that must be satisfied to allow admission of evidence under the plain view doctrine: (1) the officer must lawfully be on the premises; (2) the discovery must be "inadvertent"; and (3) it is "immediately apparent" that the incriminating evidence is seizable as evidence of a crime. *Id.* It then asserts that "inadvertence" is the only factor seriously challenged by Fields, and argues that the evidence establishes that factor.

While the three-part test of *Coolidge* served as the standard for admissibility of evidence under the plain view doctrine for many years, in 1990, the United States Supreme Court modified these criteria by deleting the element of "inadvertence." *Horton v. California,* 496 U.S. 128, 129–31, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990); *see State v. Haley,* 811 S.W.2d 597, 599 (Tex.Cr.App. 1991). Thus, the air freshener will be admissible provided the evidence establishes that Roberts was lawfully in the Lincoln, and it was immediately apparent that the air freshener was seizable evidence of a crime. *Id.*

The evidence at trial with regard to Roberts' presence in the vehicle showed that after the initial search and inventory of the Lincoln, Roberts had it impounded in a secured yard, and he retained its key. Further, it was the local law enforcement officers' policy to leave inventoried items inside the impounded vehicle. The following morning, Roberts contacted the Lincoln's rental agency, and informed it of the Lincoln's location. The agency, in turn, informed Roberts that it would send someone to obtain possession of the Lincoln that day. Because the Lincoln was being released, Roberts went to the impounded vehicle to locate and remove all personal effects and belongings from the vehicle. At that time, Roberts had with him a copy of the Lincoln's inventoried contents. Although Fields argues that everything Roberts needed from the inventory was contained in the trunk, we cannot disregard Roberts' testimony that department policy was to leave inventoried items in the locked

vehicle, that he believed he may have retrieved an inventoried beeper from inside the vehicle's interior, and that items other than those originally found in the trunk were also contained on the inventory. From the evidence presented, we thus hold that Trooper Roberts discovery of the air freshener inside the Lincoln was lawful. *See Haley*, 811 S.W.2d at 599.

Having satisfied the first element of *Coolidge*, we must next determine whether in discovering the air freshener, it was immediately apparent that Roberts had discovered evidence of a crime. The "immediately apparent" prong of the plain view analysis does not require actual knowledge of incriminating evidence. *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (reasonable person standard applied to officer's knowledge regarding drugs transported in balloons). "The focus is whether the officer has probable cause to believe that the evidence discovered is associated with criminal activity." *Joseph v. State*, 807 S.W.2d 303, 308 (Tex.Cr.App.1991).

In the instant case, Roberts testified that when the duffle bag from underneath the hood was opened, he noticed that it emitted a strong perfume odor. Then, the next day, when Roberts saw the air freshener, he recalled the strong perfume smell that the duffle bag had emitted and believed that the bag might have been sprayed with the air freshener found in the Lincoln. Thereafter, he seized the container as evidence.

In *Hicks*, unlike the instant case, on finding the stereo components, the equipment had to be moved and serial numbers had to be checked before it was determined that the equipment had been stolen. Moreover, those officers were in the defendant's apartment on an unrelated shooting crime. Here, on the other hand, the air freshener was seized in connection with the possession crime for which Fields had already been arrested. *Joseph* is likewise distinguishable from the instant case. In *Joseph*, during execution of a search warrant in connection with a case for possession of marijuana, officers seized an envelope containing a greeting card. On appeal, the court noted that the record was devoid of evidence showing that it was immediately apparent to the police officer that the greeting card was evidence of a crime. Only after the officer read the contents of the card did he realize its incriminating nature. *Joseph*, 807 S.W.2d at 309. Consequently, the Court found that the card was the product of an unreasonable search and seizure.

Here, unlike *Joseph* and *Hicks*, Trooper Roberts connected the air freshener with the duffle bag of cocaine upon discovering it. Fields argues in passing that Roberts had to have sprayed the air freshener before he recognized it as evidence. We disagree. At trial, Roberts testified as follows with regard to the air freshener's immediate connection with the duffle bag:

> When we retrieved the bag at the Sheriff's Office, it had a strong smell, a perfume scent on it. When I saw that [the air freshener] in the car I thought that is what they used to cover the scent. That is something that is done when people haul drugs. They use this to spray on their drugs to help mask or cover the scent.

Thus, the fact that he may have later compared its odor with that contained in the duffle bag is inconsequential.[1]

Given the facts before us, we hold that the evidence established it was immediately apparent to Roberts that the air freshener was seizable evidence in connection with the possession offense. Fields' fourth point of error is overruled.

In his fifth point of error, Fields argues that the trial court erred in overruling his objection to Lieutenant Allen's testimony as to drug trafficker patterns and characteristics because they were not relevant to the instant case, and even if they were, their prejudicial effect outweighed any probative value they might have had.

The State called Keith Allen, a lieutenant with the D.P.S. narcotics service as an expert

---

1. In response to the State's later question as to whether the odor that "emanated or that comes out of" the air freshener can was the same as that on the towels in the duffle bag, Roberts merely answered that it was. Thus, there is even some evidence that the container emanated an odor without being sprayed.

witness. Expert testimony is admissible if it will help the jury understand the evidence or determine a fact in issue. TEX.R.CRIM.EVID. 702. An expert witness is one who will testify to matters requiring "scientific, technical, or other specialized knowledge." *Id.* An expert may be qualified to speak on such matters by virtue of his "knowledge, skill, experience, training, or education." *Id.* Allen's expertise in the area of investigation of narcotics crimes is not challenged by Appellant.

As stated, Allen testified that based upon his experience, 6.6 pounds of cocaine would sell for approximately $60,000 wholesale in the Northeast Texas area, and that the same amount would sell for as much as $900,000 on the street. Allen's testimony as to the value of the cocaine found in the duffle bag under the Lincoln's hood is not challenged on appeal. Allen also testified, however, that through his work, he was familiar with the patterns and characteristics of people who transport narcotics. He then testified over timely objections based on relevance and TEX.R.CRIM.EVID. 403 that the following characteristics or patterns commonly existed among "people who would be traveling with quantities" of controlled substances and particularly cocaine: they (1) do not drive vehicles registered to them; (2) are deceptive as to their destination and the length of time they will be travelling; (3) carry an inadequate quantity of clothing for their projected stay, that often being only one change of clothes between the individuals that occupy the vehicle; (4) generally display wealth while their stated employment would not support such wealth; (5) are generally very friendly; and (6) carry electronic pagers. On cross-examination, however, Allen admitted that hundreds of thousands of people who are not drug traffickers drive rented vehicles and carry pagers. He further testified that he had no personal knowledge as to whom the cocaine in evidence belonged. Additionally, Allen testified that drug traffickers often carry a lot of money with them.

The TEXAS RULES OF CRIMINAL EVIDENCE define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable ... than it would be without the evidence." TEX. R.CRIM.EVID. 401. Appellant cites *Nelms v. State,* 834 S.W.2d 110 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd) in support of his contention that Allen's testimony was irrelevant. In *Nelms,* the appellant was arrested at a convenience store for possession of cocaine after he was seen dropping two rocks of cocaine beside a video game. At the time of his arrest, the appellant was wearing a pager. At trial, two of the prosecution's witnesses *repeatedly* testified over the appellant's objection that the appellant was wearing a beeper and that almost all drug dealers wear beepers. On appeal, the court of appeals held:

> The testimony was inadmissible evidence of extraneous criminal conduct under rule 404(b). This evidence invited the jury to convict appellant of possession because he was a drug dealer in general ... The evidence about drug dealing was not relevant to any issue in the case and was calculated to prejudice the jury by referring to extraneous matters for which appellant was not on trial. We hold it was error to admit the evidence under rule 404(b).

*Id.,* at 114.

*Nelms* is readily distinguishable from the instant case. First, the case at bar does not involve a rule 404(b) objection. Furthermore, Allen's testimony did not characterize Fields and Johnson as "drug dealers" nor did it lead the jury astray from the issue of possession. Instead, Allen's testimony succinctly presented various factors common among persons transporting drugs via automobile. This testimony coupled with Allen's testimony on the wholesale and street values of 6.6 pounds of cocaine was relevant to the issue of the parties' knowledge that the drug was present under the hood. From Allen's testimony, the jury could also glean that the presence of drugs in an automobile under circumstances like those here was often the result of team work, and thus, tended to negate the possibility that either codefendant was unaware of the contraband's presence under the hood. Accordingly, the trial court did not abuse its discretion in overrul-

ing Fields' objection as to the relevance of Allen's testimony.

A finding of relevance, however, does not end our inquiry. We must next determine whether under rule 403, the probative value of Allen's testimony was outweighed by the danger of unfair prejudice. Fields relies on *Stewart v. State*, 874 S.W.2d 752 (Tex.App.— Houston [1st Dist.] 1994, pet. ref'd), to support his position that Allen's testimony was highly prejudicial. In *Stewart*, the appellant was arrested for possession of a small quantity of cocaine found in his motel room. At trial, the arresting officer was allowed to testify at length regarding his knowledge of drug trafficker conduct allegedly in order to establish his expertise regarding street level drug trafficking. During his testimony, the officer testified extensively about the meanings of various drug terminology and the purposes and uses of various types of drug paraphernalia, some of which was found in the appellant's hotel room.[2] On appeal, the court found that the officer's "experience dealing with narcotics trafficking was relevant to his qualifications as an expert on the use of drug paraphernalia. His testimony about the use of drug paraphernalia was, in turn, relevant to the showing of knowing possession." *Id.*, at 756. The court, however, concluded that the State had used the wrong line of questioning to qualify the officer as an expert: "The State should have qualified Officer Thane as an expert on the usage of drug paraphernalia through testimony about his arrests of suspects for drug possession, and through testimony of his

training and education on the subject. It should not have elicited testimony of his experience with drug dealers." *Id.* The court then concluded that because the officer's testimony about the drug trade may have interfered with the jury's deliberations on guilt, the prejudicial effect of the officer's testimony outweighed is probative force. *Id.*

██ In the instant case, the State presented no such dissertation on drug use or trafficking. Instead, Lieutenant Allen merely gave brief testimony as to his ten and a half years' employment with the Department of Public Safety and his involvement as Task Force Commander over the Narcotics Task Force Unit, which enforces narcotics laws in Hopkins, Wood, Rains, Camp, Franklin and Titus County. Having reviewed Allen's testimony, we conclude that the instant case is readily distinguishable from *Stewart*, and that the probative value of Allen's testimony outweighed any prejudicial effect it might have had. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

Having found Allen's testimony both relevant and probative on the issue of knowing possession, we overrule Fields' fifth point of error.

██ In his seventh, eighth, ninth, tenth and eleventh points of error, Fields alleges that the trial court erred in failing to sustain his objections during closing argument. The Court of Criminal Appeals has held that the four areas of acceptable jury

2. This is but one example of the detailed testimony the State elicited from Officer Thane during the *Stewart* trial:

[OFFICER]: A known drug dealer is a phrase that we give to a person that has been documented as a narcotics trafficker or dealer because of prior convictions of narcotics, arrests or information received and documented that he is actually trafficking in narcotics at the present time.
[STATE]: Now, how is crack or rock used?
[OFFICER]: Crack cocaine is utilized by inhaling it or smoking it. The way that it is ingested into the body is usually by utilizing a crack pipe. It is sometimes smoked in marijuana cigarettes, which is called a 151 or, like, in regular Marlboro cigarettes or Kool cigarettes. It can be introduced into the body that way.

The way it's introduced is it's chipped up in real small pieces. Those pieces are put into the cigarette or into the crack pipe, and then the heat source is applied to it. It turns the crack from the solid form to a liquid form to a gas form, and then it's inhaled into the body, and then it goes from the lungs into the bloodstream.
[STATE]: What is a tamping rod?
[OFFICER]: A tamping rod is used—it's usually either a very small stick, a toothpick, a piece of coat hanger, something that is very small, cylinder in shape, that has got a point on it that can be used to push down the piece of rock into the crack pipe. *Stewart*, 874 S.W.2d 754–55.

argument are: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. *Darden v. State,* 629 S.W.2d 46, 52 (Tex.Cr. App.1982); *Alejandro v. State,* 493 S.W.2d 230, 231 (Tex.Cr.App.1973). For error to be reversible, the comment, viewed in light of the record as a whole, must be extreme or manifestly improper, violative of a mandatory statute or must inject into the trial new facts harmful to the accused. *Allridge v. State,* 762 S.W.2d 146, 155 (Tex.Cr.App.1988), *cert. denied,* 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989). In arriving at our decision, this Court is to determine whether there is a reasonable possibility that the comment made subject of complaint might have contributed to the conviction or the punishment assessed. *Id.*

In his seventh point of error, Fields asserts that the trial court erred in overruling his objection to the State's argument that he had the burden to put on witnesses. The prosecutor had argued that an unidentified individual only referred to as "Uncle" could have been called to testify as to what Fields and Johnson had been doing the preceding five days while they were in Dallas. The State's reference to "Uncle" was in response to Johnson's attorney's argument in which he listed on the blackboard potential witnesses that had not been called by the State. State's counsel had suggested that the list could have been supplemented by adding "Uncle"; it was not argued that Fields had the burden or obligation to summon this witness. Furthermore, Fields cites no authority to support his contention on this point.[3] For these reasons, we conclude there is no merit to the point and it is overruled.

Fields' eighth point complains that the State improperly argued in the punishment phase of the trial that he was going to multiply the value of the cocaine. The State's attorney stated:

The law says that you can't have more than four hundred grams of cocaine and get less of a sentence than ten years. Four hundred grams is less than a pound. These men chose to possess six point six pounds of cocaine. They could have chosen not to have any cocaine. They know what the consequences of violating the laws are. They know that if you violate the laws of Texas or Tennessee or the Federal Government you get punished and you go to prison. But the reward was great enough that they took the risk. The reward was great enough to be in possession of sixty-six thousand dollars worth of cocaine that you can turn into three hundred thousand dollars to nine hundred thousand dollars.

Attorneys for the defense objected to this argument on the basis that there was no evidence that Fields or Johnson were going to turn the cocaine into that amount of money. They also asserted that "this is a possession case, not a delivery case." The trial court then overruled the objection stating: "All right. The jurors will recall the testimony as they recall it to be. Overrule your objections."

On appeal, Fields argues that the State's argument was highly inflammatory since this was a possession and not a delivery case. In support of his position, he cites *Turrentine v. State,* 536 S.W.2d 219, 220 (Tex.Cr.App.1976). In that case, the appellants had been convicted of possessing 8.15 ounces of marijuana. In *Turrentine,* during closing argument at the punishment phase, the State commented:

Now, I don't smoke marihuana and I assume you don't either, and there's no evidence about how much of the stuff it would take to make a marihuana cigarette, but you can call for it and look at it if you want it. I submit it's a reasonable deduction from the evidence there's enough marihuana to make a man and wife high and keep them high until the year 1990. I submit this is more marihuana than this man and wife ever intended for their own personal use, and it's a reasonable deduction from the evidence that they are not only smok-

---

3. In his brief, Fields' entire presentation on this point is as follows:

"During the guilt-innocence phase of trial, the State argued that the defense had the burden to put on witnesses. (SF 375–376). Counsel objected, the objection was overruled. (SF 375–376). This is reversible error."

ing it but probably giving it away or selling it.

On appeal, the court found the argument quoted above tended to greatly exaggerate the amount of marihuana found in appellant's possession. It then noted that although a "reasonable deduction from the evidence," the exaggeration as to quantity and the conclusion that "they are not only smoking it, but probably giving it away or selling it" were not justified by the evidence and thus constituted error.

 For obvious reasons, Fields' case is distinguishable from *Turrentine*. The argument here contains no exaggeration and draws no conclusion that Fields intended to sell the cocaine. Instead, the State merely deduced from the evidence that since there was a severe penalty for possessing such a large quantity of cocaine, Fields and Johnson must have been significantly rewarded for daring to possess it. The State was not arguing that Fields and Johnson were going to sell the cocaine themselves for a large profit. The State's argument provides a reasonable summation of the evidence of value followed by a reasonable deduction from that evidence. *See Layne v. State,* 752 S.W.2d 690, 695 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd). Appellant's eighth point of error is overruled.

 In his ninth point, Fields contends that the State improperly argued:

If you folks want to go home tonight and sleep, if you want to be sleeping fifteen years from now or twenty years from now or thirty years from now and know that Mr. Fields and Mr. Johnson aren't able to be driving up and down the road with their cocaine, you know what you need to do.

The court overruled Fields objection that the argument "puts the jury in the position of a future alleged victim." He cites two precedents, both of which involved specific direct victims of the respective offenses. *Boyington v. State,* 738 S.W.2d 704 (Tex.App.—Houston [1st Dist.] 1985, no pet.); *Everett v. State,* 707 S.W.2d 638 (Tex.Cr.App.1986). No such error is presented in this possession case where there is no evidence of a victim at the time of the offense or in the future. We

construe this argument as one for law enforcement. The ninth point is overruled.

By his tenth point of error, Fields asserts that the following argument was improper:

You folks have got a hard job to do. Its always hard to send somebody to prison. But did you hear one reason why you shouldn't? Did you hear one single reason why these two shouldn't go to prison? Did anybody's uncle or sister or girlfriend or mother—

On appeal, Fields urges that this argument was improper in the punishment phase because it suggests that Fields had been abandoned by his family. At trial, however, Fields objected on the ground that the Defendants were not required to call any witnesses and that the State's argument shifted the burden and was contrary to the charge.

 To preserve any error in jury argument for appeal, counsel must have asserted a proper objection. *Green v. State,* 682 S.W.2d 271, 295 (Tex.Cr.App.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). Moreover, the basis of complaint at trial is the only one that may be asserted on appeal. *Miller v. State,* 566 S.W.2d 614, 619 & 621 (Tex.Cr.App.1978). In the instant case, Field's complaint on appeal differs from that raised at trial. Consequently, the point has not been preserved for review. Point ten is overruled.

By his eleventh point of error, Fields alleges that the trial court erred in overruling his objection to the State's argument at punishment regarding community expectation. At the conclusion of the State's closing argument, the State's attorney argued:

Folks, you go upstairs and write down life in that block where it says number of years and write a hundred thousand dollars fine where it says fine, and each and everyone of you ought to be able to go home tonight knowing what you did was right for yourself, your family, your children, and everybody in this community and across the State.

Defense counsel objected stating: "[W]e will object to the prosecutor asking for a life sentence in that the community expects that kind of sentence or that the children of these

jurors will benefit from assessing the defendants. We object to that." On appeal, Fields argues that this is the same type of argument which resulted in a reversal in *Cortez v. State,* 683 S.W.2d 419, 420–21 (Tex. Cr.App.1984). In *Cortez,* the State's attorney argued: "Now, the only punishment that you can assess that would be any satisfaction at all to the people of the county would be life [imprisonment]." *Id.,* at 420.

The instant case is readily distinguishable from *Cortez.* Here, the State merely argued that if the jurors assessed the maximum sentence, they could be assured that they had made the right decision for themselves, their community and the citizens of this State. Despite Fields' counsel's attempt to recharacterize this argument through his trial objection as an improper one, the State did not inappropriately argue the demands and expectations of the community; it simply made a proper plea for law enforcement. *See Luna v. State,* 461 S.W.2d 600, 601 (Tex.Cr.App.1970) (holding no reversible error in prosecutor's argument that "people that have such ideas in this county in the future will be put on notice that the citizens of this county are not going to put up with it"); and *Lawson v. State,* 896 S.W.2d 828, 833 (Tex.App.—Corpus Christi 1995, pet. ref'd) (holding that argument requesting jury to "send a very strong message to this man and everyone else in this community or whatever who thinks it's okay to get out there and poison the community with drugs" was proper plea for law enforcement). Fields' eleventh and final point of error is overruled.

The judgment of the trial court is **affirmed.**