

# NUMBERS 13-14-00237-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**THE STATE OF TEXAS,**                                         **Appellant,**

**v.**

**ISAAC SASTAITA,**                                             **Appellee.**

## On appeal from the 105th District Court
## of Kleberg County, Texas.

# MEMORANDUM OPINION

## Before Chief Justice Valdez and Justices Rodriguez and Perkes
## Memorandum Opinion by Justice Perkes

The State appeals the trial court's granting of appellee Isaac Sastaita's motion to suppress. Sastaita was arrested for possession of marijuana, a state jail felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115 (a), (b) (West, Westlaw through 2015 R.S.). By one issue, the State argues that because the arresting officer reasonably suspected

that Sastaita was, or soon would be, engaged in criminal activity, the trial court abused its discretion in granting Sastaita's motion to suppress. We affirm.

## I.    BACKGROUND

Following his arrest for drug possession, Sastaita filed a motion to suppress. Kingsville Police Officer Ernie Martinez testified during the hearing that he stopped Sastaita for a speeding violation. As he approached Sastaita's car, he observed that Sastaita's face was pale, that he was visibly shaking, and that he was extremely nervous. When he asked Sastaita for his driver's license, he was still shaking.[1] Officer Martinez concluded "something [was] not right" and called Officer Daniel Gonzalez for backup and to conduct additional inquiry. After calling for backup, Officer Martinez spoke with Sastaita and asked about car insurance—Sastaita stated that he had none. Officer Martinez also asked about Sastaita's prior criminal history—Sastaita replied that he had none. Officer Martinez, however, later discovered Sastaita had a prior arrest for drug possession. Officer Gonzalez arrived approximately three to four minutes after receiving the call, while Officer Martinez was working on issuing the traffic citation.

Officer Gonzalez testified that, upon his arrival, he "made contact with the initiating officer for the traffic stop, and . . . gathered details of the traffic stop and what he had at hand and why he requested back-up." Officer Gonzalez asked Sastaita if he would be willing to talk to him, and Sastaita said yes. Officer Gonzalez observed Sastaita was

---

[1] During a routine stop for a traffic violation by the driver, officers may question the driver; request his license, insurance papers, and information on ownership of the vehicle; and ask about the driver's destination and the trip's purpose. *See St. George v. State*, 197 S.W.3d 806, 817–18 (Tex. App.—Fort Worth 2006, pet. granted), *aff'd*, 237 S.W.3d 720 (Tex. Crim. App. 2006).

"overly nervous." Officer Gonzalez questioned Sastaita about his travels and whether he possessed narcotics or illegal weapons. Officer Gonzalez stated that when he asked Sastaita about drugs, Sastaita became "extremely nervous" and his voice was shaking. According to Officer Gonzalez, Sastaita also behaved oddly by "pat-searching" himself in response to questions about drugs and weapons. Based upon what he had been told and his observations, Officer Gonzalez believed that "deception . . . not just nervousness" was transpiring. Based on Sastaita's behavior, Officer Gonzalez claimed that he reasonably suspected Sastaita was involved in criminal activity and requested to search Sastaita's vehicle. When Sastaita declined, Officer Gonzalez told Sastaita that he was being detained and that he would have to wait for the arrival of a canine unit. At that point, Sastaita admitted he had marijuana inside the vehicle. He was subsequently arrested.

During the hearing, Sastaita's sole argument was that the stop was illegally prolonged beyond the initial justification for the traffic stop without reasonable suspicion. After the trial court granted Sastaita's motion to suppress, the State requested findings of fact and conclusions of law. None were issued. We granted the State's motion to abate the appeal and remanded the case to the trial court for the entry of findings of fact and conclusions of law. *See* TEX. R. APP. P. 44.4. The trial court adopted the following findings of fact and conclusions of law:

1. Isaac Sustaita [sic] was stop [sic] for a traffic violation. Isaac Sustaita [sic] presented the Officer Ruben Trevino[2] with his driver's license.

---

[2] The record is devoid of any reference or evidence regarding a person named "Ruben Trevino."

3

2. Officer Ruben Trevino then began a fishing expedition by asking questions of Isaac Sustaita [sic].

3. Officer Martinez asks dispatch if either Detective Tamez[3] or Detective Gonzalez were on duty to continue the investigation of Mr. Sustaita [sic].

4. Officer Martinez issues Mr. Sustaita [sic] a citation for speeding and failing to display proof of finical [sic] responsibility.

5. Detective Gonzalez then arrived on location and began to integrate [sic] Mr. Sustiata [sic] after the citation was issued.

6. Isaac Sustaita [sic] then refuses to consent to a search of his vehicle.

The trial court concluded:

The legal justification or purpose of the stop was to warn or cite the driver for a traffic violation. In the case at bar the officer engaged in a fishing expedition. Law enforcement officers are not allowed to engage in a "fishing expedition to determine whether there were drugs" in the vehicle by prolonging an investigatory detention without reasonable suspicion "sufficient to continue the dentition [sic] and prolong the traffic stop for the purposes of conducting a drug investigation.["]

## II. DISCUSSION

By its sole issue, the State argues that the trial court erred by granting Sastaita's motion to suppress. Specifically, the State contends the arresting officer had specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect Sastaita had engaged in or was, or soon would be, engaged in criminal activity. We disagree.

## A. Standard of Review

---

[3] Michael Tamez is a Criminal Interdiction Officer with the Kingsville Police Department. He was not present during the traffic stop but testified during the hearing regarding investigative techniques.

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). In reviewing a trial court's ruling on a motion to suppress evidence, we use a bifurcated standard. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (en banc) (citing *Guzman v. State*, 955 S.W.2d 85, 88 (Tex. Crim. App. 1997) (en banc)). We give almost total deference to the trial court's findings of historical fact that are supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (citing *Guzman*, 995 S.W.2d at 89). We "review de novo 'mixed questions of law and fact' that do not depend upon credibility and demeanor." *Id.* (quoting *Montanez v. State*, 195 S.W.3d 101, 107 (Tex. Crim. App. 2006)); *Guzman*, 995 S.W.2d at 89.

However, as with the question of whether a consensual encounter has become a Fourth Amendment detention, the question of whether a certain set of historical facts gives rise to reasonable suspicion is reviewed de novo. *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013); *see Davis v. State*, 947 S.W.2d 240, 249 (Tex. Crim. App. 1997) (en banc) (Keller, J., concurring); *see also Madden v. State*, 242 S.W.3d 504, 517 (Tex. Crim. App. 2007) (providing that we review the legal question of whether totality of circumstances is sufficient to support officer's reasonable suspicion de novo). We will affirm the trial court's ruling excluding the evidence if the ruling is reasonably supported by the record and correct on any theory of law applicable to the case. *See State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). Under this rule, we must "determine whether the trial court could have reasonably [ruled as it did] given the record evidence

and given the applicable federal and state law." *State v. White*, 306 S.W.3d 753, 757 n.10 (Tex. Crim. App. 2010) (citing *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003)).

**B.      Applicable Law**

The Fourth Amendment, made applicable to the states by the due process clause of the Fourteenth Amendment, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).[4]   The Fourth Amendment is implicated because whenever a government official directs a vehicle to stop, however briefly, he has thereby "seized" the occupant, for the stop inevitably restrains that person's freedom of movement.  *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450 (1990).  We analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated by the United States Supreme Court in *Terry v. Ohio*.  *See United States v. Brigham*, 382 F.3d 500, 507–08 (5th Cir. 2004) (en banc); *see also Terry*, 392 U.S. 1, 21–22 (1968); *United States v. Pack*, 612 F.3d 341, 349–50 (5th Cir. 2010); *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004).   Under this standard, we make a two-part inquiry.  *Brigham,* 382 F.3d at 506.   First, we examine whether or not the officer's decision to stop the vehicle was justified at its inception.  *Id.*   Second, we determine

---

[4] In analyzing and interpreting article one, section nine of the Texas Constitution, we are not bound by United States Supreme Court decisions that address the Fourth Amendment.  *Heitman v. State*, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991) (en banc).   However, the interpretation of Texas search and seizure law is currently the same as the Supreme Court's interpretation of the Fourth Amendment.  *See Johnson v. State*, 912 S.W.2d 227, 233–34 (Tex. Crim. App. 1991) (en banc).

whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *Id.*

An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupant beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops a reasonable suspicion of additional criminal activity in the meantime. *Id.* at 507. The United States Supreme Court has expressly rejected placing any rigid time limitations on *Terry* stops; instead, the issue is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Kothe*, 152 S.W.3d at 64 (quoting *United States v. Sharpe,* 470 U.S. 675, 685–86 (1985) (declining to "establish per se rule that 20–minute detention is too long" under *Terry*)).

A detention may not be unnecessarily prolonged solely in hopes of finding evidence of some other crime. *Id.* The stop may not be used as a "fishing expedition for unrelated criminal activity." *Davis*, 947 S.W.2d at 243 (quoting *Ohio v. Robinette*, 519 U.S. 33, 41 (1996) (Ginsberg, J., concurring)). But if reasonable suspicion of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled, then a continued detention may be justified until the new suspicion has been confirmed or dispelled. *Id*; *see Perales v. State*, 117 S.W.3d 434, 439 (Tex. App.—Corpus Christi, 2003, pet. ref'd).

Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead the officer to reasonably

conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001); *see Ford v. State,* 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). After the initial detention, various combinations of factors will support a reasonable suspicion of criminal activity, sufficient to justify continued detention independent of the initial detention. *See Sims v. State,* 98 S.W.3d 292, 296 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (determining that there was reasonable suspicion to justify continued detention where another car of same make and model traveled erratically in front of defendant; defendant's car contained "large amount" of air fresheners; defendant was extremely nervous; defendant hesitated as she spoke; defendant put her hands up when asked to step out of the car; and defendant was driving rental car without rental agreement); *Powell v. State*, 5 S.W.3d 369, 377 (Tex. App.—Texarkana 1999, pet. ref'd) (concluding that reasonable suspicion premised upon nervousness, conflicting information, prior drug arrests, and lying about prior arrests); *Fields v. State*, 932 S.W.2d 97, 105 (Tex. App.—Tyler 1996, pet. ref'd) (explaining that reasonable suspicion existed to detain car that had been stopped for speeding based upon extreme nervousness of driver; driving with suspended license; passenger's history of drug offenses; and occupants' inconsistent versions of recent activities).

The burden is on the State to elicit testimony showing sufficient facts to create a reasonable suspicion. *Garcia,* 43 S.W.3d at 530. The totality of the suspicious circumstances that an officer relies on "must be sufficiently distinguishable from that of innocent people under the same circumstances as to clearly, if not conclusively, set the suspect apart from them." *Wade v. State*, 422 S.W.3d 661, 671 (Tex. Crim. App. 2013).

8

In our determination regarding whether reasonable suspicion existed for prolonging a traffic stop, we give due weight not to the officer's inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences that he was entitled to draw from the facts in light of his experience. *See Davis,* 947 S.W.2d at 242. Any investigative detention that is not based on reasonable suspicion is unreasonable and violates the Fourth Amendment. *Id.*

**C.  Analysis**

The parties do not contest the reasonableness of the stop; consequentially, the analysis turns on the second prong of the *Terry* analysis.[5] The trial court did not indicate what facts, if any, the police officers relied upon to justify a continued detention. Instead, the State argues that Officer Gonzalez was justified in detaining Sastaita because Sastaita had a prior criminal arrest for drug possession and lied about it, Sastaita was extremely nervous, and Sastaita exhibited some deception when answering Gonzalez's questions about drugs.

**1.  Timeline**

We first examine the scope of the initial detention, noting that we are not permitted to weigh the credibility of the witnesses. *See Villarreal v. State*, 631 S.W.2d 205, 206 (Tex. App.—Corpus Christi 1982, no pet.) ("The trial court, in deciding whether to suppress evidence, is the sole judge of the witnesses' credibility[.]") Officer Martinez

---

[5] It is undisputed that Sastaita was stopped for a speeding violation. *See* TEX. TRANSP. CODE ANN. § 545.351 (West, Westlaw through 2015 R.S.). In Texas, a police officer may lawfully stop and detain a person for a traffic violation. *See Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992). Accordingly, we conclude that it was reasonable for Officer Martinez to stop Sastaita. *See id*; *see also* TEX. TRANSP. CODE ANN. § 545.351.

9

stopped appellant to investigate the speeding violation. Once he concluded that investigation, he could not detain Sastaita any longer without a reasonable suspicion that another offense was being committed. *Perales,* 117 S.W.3d at 439; *see Freeman v. State*, 62 S.W.3d 883, 887 (Tex. App.—Texarkana 2001, pet. ref'd). Contrary to the trial court's findings of fact, we are unable to determine from the record precisely when certain events transpired, including the time when Officer Martinez concluded his investigation of the traffic violation. When asked about the citation, Officer Martinez testified:

Q. You said that you called for an interdiction officer to come to the scene. Do you recall how long it took for Officer Gonzalez to arrive on-scene?

A. Not very long, maybe three to four minutes, not long at all.

Q. What were you doing during this time?

A. Issuing citation.

Q. Okay. How long does that process usually take, to enter the information and print out a ticket?

A. Maybe two to three minutes.

Q. So—

A. Sometimes it could take longer, depending on the actual system itself, if it's running slow. It depends.

Q. And what were you doing after Officer Gonzalez arrived?

A. I stayed back. I continued—as he—as he rolled up, as he arrived on location, I was still issuing the citation, so I stayed back and did what I needed to do.

As a result, we are unable to determine whether Officer Gonzalez developed reasonable suspicion to prolong the detention before the purpose for the initial stop ended. *See*

10

*Seiffert v. State*, 290 S.W.3d 478, 483 (Tex. App.—Amarillo 2009, no pet.) ("Although no rigid time limitation exists on its length, a traffic stop is temporary and may last no longer than necessary to effectuate its purpose.")

Further, the record is silent concerning when Officer Martinez learned of Sastaita's prior drug arrest. Officer Martinez testified during direct examination:

Q. Do you recall whether or not you asked the driver if he had any criminal history?

A. I do.

Q. Do you recall his answer?

A. He advised that he did not.

Q. And did you later find out from dispatch that that was incorrect?

A. That he did have a—

Q. How did you find that out?

A. Dispatch advised me.

Q. And how much time does something like that take?

A. Approximately two minutes.

Q. Were you also able to observe his behavior during that time?

A. While I was—while I was in the driver's side, yes, I was able to observe it.

Consequently, we are unable to determine whether or not either officer learned about the prior arrest before or after the detention became prolonged. If neither officer found out about Sastaita's prior arrest until after they prolonged the detention, then the information

11

collectively known to the officers would not include the information about Sastaita's criminal history.

## 2. Criminal History

There is nothing in the record to indicate that Officer Gonzalez was aware of the "lie" when he informed Sastaita that he had a reasonable suspicion to continue the investigation. In fact, Officer Gonzalez does not even mention the lie in his testimony. Officer Gonzalez testified that Officer Martinez:

> Called [him] because [Officer Martinez] told [him] that when [Officer Martinez] made contact with [Sastaita] and [Officer Martinez] was talking to [Sastaita], [Officer Martinez] noticed that he was acting very differently from other people that [Officer Martinez] stopped. [Officer Martinez] said that [Sastaita] . . . was extremely nervous and that he was acting very different. And [Officer Martinez] asked if I could speak with him to see if . . . I felt there was anything else going on.

Officer Gonzalez further testified that upon arriving at the scene, he "made contact with the initiating officer for the traffic stop, and [he] gathered details of the traffic stop and what [Officer Martinez] had at hand and why [Officer Martinez] requested backup." Officer Martinez testified at the suppression hearing that he told Officer Gonzalez that the "main reason [he] needed [Officer Gonzalez] was because "[Sastaita] appeared to be "very nervous" or exhibited "extreme nervousness." There was no testimony that Officer Martinez informed Officer Gonzalez that Sastaita "lied" in response to Officer Martinez's criminal history question. *See Arguellez v. State*, 409 S.W.3d 657, 663 (Tex. Crim. App. 2013) (noting that the officer was allowed to rely on information relayed to him from police dispatcher in stopping the defendant); *see also Derichsweiler v. State*, 348 S.W.3d 906,

12

914 (Tex. Crim. App. 2011). The record supports, at best, an inference that Officer Martinez may have relayed Sastaita's "lie" to Officer Gonzalez.

Given the ambiguity in the record, we will analyze the factors that Officer Gonzalez actually stated he relied on to develop reasonable suspicion. *See Garcia,* 43 S.W.3d at 530. Officer Gonzalez testified he developed his reasonable suspicion solely based on appellee's odd behavior, specifically the extreme nervousness—encompassing the changes in tone, and the "self pat-down."[6]

### 3. Nervousness

Officer Gonzalez testified that after he noticed appellee was "overly nervous," he began to question appellee about "different types of drugs and weapons that he might be carrying on his person or inside the vehicle." Officer Gonzalez stated that the purpose of such routine questioning was to see "if I can detect any deception based on their body language, based on their nervousness and, you know, to—if there's any reasonable suspicion as to the fact that there might be contraband or not." According to Officer Gonzalez, he specifically looks for extreme nervousness when asking certain questions.

Clearly a motorist stopped and questioned by police will be nervous. *See id.* at 671 (explaining that nervousness is not particularly probative because most citizens with nothing to hide will nonetheless manifest understandable nervousness in the presence of an officer) (citing *Damato v. State*, 64 P.3d 700, 709 (Wyo. 2003) (concluding that when motorist refused to consent to a search of his car, and officer then asked "whether there

---

[6] According to Gonzalez's testimony, appellee "showed deception" through changes in his tone of voice when responding to police questioning. However, rather than being a separate indication of criminal activity, changes in tones of voice are manifestations of nervousness. *See United States v. Portillo-Aguirre*, 311 F.3d 647, 656 (5th Cir. 2002).

13

was some reason he did not want the officer looking in the car," the motorist's extreme nervousness, including "sweating heavily although it was a chilly day, his carotid artery pulsating hard and fast, and an inability to keep eye contact," was discounted because "[r]ealistically, few citizens would not have become uncomfortable to some degree with these questions")). In light of the foregoing, we are not persuaded that Sastaita's shaking body and voice, particularly in response to police scrutiny, are reliable indicators of criminal activity in this case.

### 4. "Odd Behavior"

Officer Gonzalez characterized Sastaita's self pat-down as "odd behavior." However,

> an officer and the Government must do more than simply label a behavior as "suspicious" to make it so. The Government must also be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.

*Wade*, 422 S.W.3d at 672 (citing *United States v. Foster*, 634 F.3d 243, 248–49 (4th Cir. 2011)). The State fails to explain in its brief, just as Officer Gonzalez failed to explain in the record, how Sastaita's self pat-down was suspicious. While Sastaita's behavior may have seemed odd to Officer Gonzalez, that is not enough. *See Crockett v. State*, 803 S.W.2d 308, 313 (Tex. Crim. App. 1991) (en banc). "What matters are the objective facts that indicate *criminal activity*, not the officer's characterization of them." *Wade*, 422 S.W.3d at 672 (citing *Davis,* 947 S.W.2d at 242) (emphasis added). Therefore, we disagree that Sastaita's purportedly odd behavior was probative in justifying Officer Gonzalez's reasonable suspicion.

14

**D.**     **Summary**

We conclude that Sastaita's nervousness and "odd behavior" were insufficient to constitute reasonable suspicion.   Sastaita's statement about marijuana in his car was derived from Officer Gonzalez's illegal detention and was "fruit of the poisonous tree" and therefore that statement could not provide probable cause for searching appellee's car. *See Wade,* 422 S.W.3d at 675.   The trial court correctly granted Sastaita's motion to suppress.   The State's sole issue is overruled.

### III.     CONCLUSION

We affirm the trial court's order.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
17th day of December, 2015.