James BLACKMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–08–00138–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 22, 2009.

Discretionary Review Granted
June 16, 2010.

Rosa Alexander Eliades, Houston, TX, for Appellant.

Mandy Goldman Miller, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, KEYES, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

We deny the State's motion for rehearing. *See* TEX.R.APP. P. 49.3. We withdraw

our August 27, 2009 opinion, substitute this opinion in its place, and vacate our August 27, 2009 judgment.[1]

A jury found appellant, James Blackman, guilty of the offense of possession of a controlled substance, namely cocaine, with intent to deliver[2] and assessed his punishment at confinement for thirty years. In three points of error, appellant contends that the evidence is legally and factually insufficient to support his conviction and that the trial court erred in denying his *Batson*[3] challenge.

We reverse and render.

### Factual Background

Pasadena Police Department ("PPD") Detective T. Neilon testified that on June 14, 2007, while "conducting surveillance at a Super 8 Motel," he saw three men arrive in a "Chrysler mini-type van with North Carolina plates" and check into the motel for the night. The driver, later identified as James Gordon, and the two passengers, later identified as appellant and Mario Ayala–Garcia, spent the night at the motel. Neilon, the next morning, saw the three men load their luggage, check out of the motel, and drive away. Neilon noticed that Gordon drove the van, appellant sat in the front passenger seat, and Ayala–Garcia sat "in the back passenger's seat of the van directly behind [appellant]."

Detective Neilon continued his surveillance of the three men throughout the day. Neilon followed the men to a "tire shop," a car wash, a clothing store, and then back to the car wash. At the car wash, Gordon parked the van in one of the stalls as rain began to fall. As the men waited inside the van, Neilon noticed that the van's "headlights were on, and the windshield wipers were going back and forth." After forty to fifty minutes, a green Toyota Camry stopped in front of the van, paused, and then drove away. Gordon, still driving the van, followed the Toyota into a residential neighborhood where the Toyota and the van parked on the side of the road. As Neilon continued his surveillance driving past the van, he saw appellant "at the back of the van with the hatch open." Appellant appeared to be "retrieving something out of the van." Neilon also saw Gordon and the driver of the Toyota "walking towards the rear of the van, kind of side by side." Neilon then lost his line of sight.

When Detective Neilon re-established his surveillance of the van, he saw that the van had been moved to the other side of the street and was facing the opposite direction. After fifteen to twenty minutes, Neilon saw the two vehicles drive around the neighborhood and then return to their previous location. After the vehicles stopped, Neilon saw a man get out of the Toyota and carry "a box of some type with both hands" to the van. The man handed the box to Gordon through the window, shook Gordon's hand, and then walked back to the Toyota.

When the vehicles drove away, Detective Neilon again followed the van. Noticing that Gordon's driving had become "very erratic," Neilon contacted PPD Detective C. Scott, who was nearby in a marked patrol car. Scott followed the van and eventually initiated a traffic stop. Neilon

---

1. As we have issued a new opinion, we dismiss the State's motion for en banc reconsideration as moot. *See Hartford Fire Ins. Co. v. C. Springs 300, Ltd.,* 287 S.W.3d 771, 774 (Tex.App.-Houston [1st Dist.] 2009, pet. denied).

2. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.002(5), 481.102(3)(D), 481.112(a), (f) (Vernon Supp. 2009).

3. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

joined Scott and the three men from the van at a gas station, where he saw that Scott had asked appellant, Gordon, and Ayala–Garcia to step outside of the van. With the men out of the van, Neilon and other police officers searched the van and recovered a box that contained three kilograms of cocaine.

On cross-examination, Detective Neilon conceded that he did not see what, if anything, appellant had "retrieved" from the back of the van. Neilon agreed that he "did not see [appellant] make contact with the driver of the Toyota" or "give the driver of the Toyota anything." Neilon further agreed that he "did not see [appellant] pass anything to Mr. Gordon." Neilon also stated that he found the box containing the cocaine "behind the driver's seat on the floorboard" with a "lid on it" and "a blanket on top of the lid." Neilon admitted that he never saw appellant "reaching behind him towards the back passenger's seat" or sitting anywhere in the van except the "front passenger's seat."

Detective Scott testified that he saw the van change lanes without signaling, failing to yield right of way, and generally driving in a "very erratic" and "unsafe" manner. After he turned on his lights and sirens, the van pulled off of the highway into a gas station. Scott asked the three men to step out of the van, and they cooperated. Scott confirmed that the box containing the cocaine was "covered by a blanket" in "the backseat on the floorboard."

On cross-examination, Detective Scott agreed that he did not see anyone in the car make any furtive movements. Scott conceded that when he looked in the back seat he "just saw the blanket there." He could not see whether there was an object under the blanket.

PPD Officer C. Williams testified that during the booking process, appellant, who had $637 in his wallet, said he was "[f]rom the Saint Petersburg, Florida area." Williams later learned that the van had been rented from Avis Rent–a–Car. Williams explained, generally, that during a traffic stop, he looks for indicators of criminal activity such as whether detainees are "overly nervous, sweating, fidgeting around," the detainees' stories change under questioning, and the detainees use props to induce officers "to let their guard down" or to tell officers "[the detainees are] good guy[s]." Williams opined that a Bible, with the name of an unknown person written in it, found in the van, and an invitation, found in the sun visor of the van, to "Wright's and Smith's Annual Family Reunion" with "no date time or specific location" were such props. He also explained that narcotics traffickers often use rented vehicles because they are not "subject to forfeiture [or] seizure by the State." He indicated that Interstate 10 East through Houston is labeled as a "pipeline for both money and drugs going east and west coast to coast."

On cross-examination, Williams testified that he later learned that the driver of the Toyota had not been identified or charged with a crime. Williams agreed that he never saw appellant "hand anything to the person in the Toyota," "receive anything from the person in the Toyota," or handle the box.

PPD Officer W.R. Kelly testified that "[Houston has] become a hub for narcotics distribution" because "it has several corridors coming into [it]," such as "major interstates that [allow] you to get [narcotics] in through the port system." He explained that three kilograms of cocaine would not be purchased for "personal use" but rather for "distribution." Kelly also explained that in hotel/motel narcotics investigations police officers generally look for "out of state cars, people paying by

cash, a lot of foot traffic in and out of the rooms." Other typical behavioral patterns of narcotics traffickers include "constantly moving about," "be[ing] on cellphones in and amongst each other," going "in and out of the room several times," and "going to different parts of town, always on the phone, continuing looking around as though they might be waiting for something." Kelly opined that it would be uncommon in "large scale narcotics transactions for … drug dealers to include other witnesses that are not involved in the deal."

### Standard of Review

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988); *Allen v. State*, 249 S.W.3d 680, 688 (Tex. App.-Austin 2008, no pet.). In our analysis, we give deference to the responsibility of the fact-finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. A jury may not, however, reasonably infer an ultimate fact from meager circumstantial evidence, none more probable than another. *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex.1997); *Deschenes v. State*, 253 S.W.3d 374, 381 (Tex.App.-Amarillo 2008, pet. ref'd); *Allen*, 249 S.W.3d at 703. To be legitimate or permissible, an infer-

ence must be deduced as a logical consequence of the facts presented in evidence, and there must be a logical and rational connection between the facts in evidence and the fact to be inferred. *United States v. Michelena–Orovio*, 702 F.2d 496, 504 (5th Cir.), *aff'd on reh'g*, 719 F.2d 738 (5th Cir.1983) (en banc). An inference, therefore, is a conclusion reached by considering other facts and deducing a logical consequence from them. *Hooper v. State*, 214 S.W.3d 9, 16 (Tex.Crim.App.2007). Evidence in a knowing possession of contraband case must amount to more than mere conjecture. *Dickey v. State*, 693 S.W.2d 386, 389 (Tex.Crim.App.1984). Speculation, or conjecture, is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Hooper*, 214 S.W.3d at 16. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id.* Thus, proof that amounts to only a strong suspicion or mere probability of guilt is insufficient to sustain a conviction. *Urbano v. State*, 837 S.W.2d 114, 116 (Tex.Crim.App. 1992); *In re J.M.C.D.*, 190 S.W.3d 779, 781 (Tex.App.-El Paso 2006, no pet.); *Hall v. State*, 86 S.W.3d 235, 240 (Tex.App.-Austin 2002, pet. ref'd); *Grant v. State*, 989 S.W.2d 428, 433 (Tex.App.-Houston [14th Dist.] 1999, no pet.). If circumstantial evidence provides no more than a suspicion, the jury is not permitted to reach a speculative conclusion. *Louis v. State*, 159 S.W.3d 236, 246 (Tex.App.-Beaumont 2005, pet. ref'd).

Our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Williams*, 235 S.W.3d at 750. If the undisputed facts allow only one logical inference, neither jurors nor the reviewing

court may disregard those facts. *Evans v. State*, 202 S.W.3d 158, 162–63 (Tex.Crim. App.2006). "If, based on all the evidence, a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt, due process requires that we reverse and order a judgment of acquittal." *Fisher v. State*, 851 S.W.2d 298, 302 (Tex.Crim.App.1993) (quoting *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App. 1992)); *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App.2004).

### Legal Sufficiency

In his first point of error, appellant argues that the evidence is legally insufficient to support his conviction because the State failed to prove that he exercised care, custody, or control over the cocaine found in the shoe box on the floorboard behind the driver's seat in the van.

Here, the State's primary theory was that appellant was in joint possession of the cocaine found in the shoe box on the floor board behind the driver's seat in the van. An individual commits the offense of possession of a controlled substance in an amount more than 400 grams if he knowingly and intentionally possesses the controlled substance in the prescribed amount, by aggregate weight, including adulterants or dilutants. *See* Tex. Health & Safety Code Ann. §§ 481.002(5), 481.102(3)(D), 481.112(a), (f). In order to prove possession with intent to deliver, the State must also prove that the defendant intended to deliver the controlled substance to another. *See id.* § 481.002(38) (Vernon Supp. 2009), § 481.112(a); *Parker v. State*, 192 S.W.3d 801, 805 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd).

To prove "possession" of a controlled substance, the State must prove that the accused (1) exercised care, custody, control, or management over the substance and (2) knew that the matter pos-

sessed was a controlled substance. *Evans,* 202 S.W.3d at 161. Possession is a "voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control." Tex. Penal Code Ann. § 6.01(b) (Vernon 2003). Not only must a person voluntarily engage in conduct, a person does not commit an offense (except for certain strict-liability offenses) unless he or she engages in the proscribed conduct with the culpable mental state that the definition of the offense requires. *See id.* § 6.02(a) (Vernon Supp. 2009); *Moss v. State,* 850 S.W.2d 788, 795 (Tex.App.-Houston [14th Dist.] 1993, pet. ref'd) (evidence must show that defendant committed voluntary act with requisite culpable mental state).

Here, the trial court also instructed the jury that it could find appellant guilty if he (1) acted with the intent to promote or assist in the commission of the offense and (2) he solicited, encouraged, directed, aided, or attempted to aid Gordon or Ayala–Garcia to possess the cocaine with the intent to deliver it. Under the law of parties, a defendant may be convicted of the offense of possession with intent to deliver if he (1) acting with the intent to promote or assist the commission of the offense, (2) solicits, encourages, directs, aids, or attempts to aid another person in committing the offense. *See* Tex. Penal Code Ann. § 7.02(a)(2) (Vernon 2003). Knowledge of the presence of cocaine is a required element for conviction as a party to the offense. *Acy v. State,* 618 S.W.2d 362, 364–65 (Tex.Crim.App.1981); *see* Tex. Health & Safety Code Ann. § 481.115(a) (Vernon Supp. 2009). However, mere presence in the vicinity of a controlled substance, or in a place where a controlled substance is being used or possessed by others, will not support a finding that a

person is a party to an offense. *Robinson v. State,* 174 S.W.3d 320, 325 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd). In fact, "mere presence, *even with knowledge of an offense,* does not make one a principal or a party to the offense and will not support a conviction." *Acy v. State,* 618 S.W.2d at 365 (emphasis added).[4] Presence, when "combined with other facts," may suffice to show that an accused was a participant in a criminal offense. *Thomas v. State,* 645 S.W.2d 798, 800 (Tex.Crim. App.1983). But one of the basic tenets of our penal code is that a person commits an offense only if he voluntarily engages in conduct which is proscribed by the penal code. *See* TEX. PENAL CODE ANN. § 6.01(a) (Vernon 2003). Conduct means an act or omission and its accompanying mental state. *Id.* § 1.07(a)(8) (Vernon Supp. 2009). Under our law, a person is not punished for his status, but for his conduct. *Beier v. State,* 687 S.W.2d 2, 4 (Tex. Crim.App.1985). In determining whether an accused has participated as a party, a court may look to events occurring before, during, and after the commission of the offense, and may rely on the actions of the accused which show an understanding and common design to do the prohibited act. *Id.*

### *Joint Possession and the "Links" Rule*

■ When, as here, the accused is not in exclusive possession of the place where contraband is found, additional independent facts and circumstances must "link" the accused to the contraband "in such a way that it can be concluded that the accused had knowledge of the contraband and exercised control over it." *Roberson v. State,* 80 S.W.3d 730, 735 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). The

evidence must demonstrate that the link between the accused and the contraband "generates a reasonable inference that the accused knew of the contraband's existence and exercised control over it." *Id.* In other words, the State must establish that the defendant's connection with the narcotics was more than just fortuitous. *Poindexter v. State,* 153 S.W.3d 402, 405–06 (Tex.Crim.App.2005).

The Texas Court of Criminal Appeals has explained that the purpose of the links rule is to "protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's [narcotics]." *Id.* at 406. The links rule "simply restates the common-sense notion that a person—such as a father, son, spouse, roommate, or friend—may jointly possess property like a house *but not necessarily jointly possess the contraband found in that house.*" *Id.* (emphasis added). Thus, "[w]hen the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband." *Id.*

■ Texas courts have identified "many non-exhaustive factors" that may demonstrate a link to contraband. *Roberson,* 80 S.W.3d at 735. These factors include (1) the accused's presence when a search is conducted, (2) whether the narcotics were in plain view, (3) the accused's proximity to and the accessibility of the narcotics, (4) whether the accused was under the influence of narcotics when arrested, (5) whether the accused possessed other contraband or narcotics when arrested, (6) whether the accused made incrimina-

---

4. *See also Baldwin v. State,* No. 01–00–00109–CR, 2001 WL 1345021, at *3 (Tex.App.-Houston [1st Dist.] Nov. 1, 2001, no pet.) (not

designated for publication) (noting that mere presence, even with knowledge of crime, is not sufficient to establish possession).

ting statements when arrested, (7) whether the accused attempted to flee, (8) whether the accused made furtive gestures, (9) whether there was an odor of contraband or narcotics, (10) whether other contraband or narcotic paraphernalia was present, (11) whether the accused owned or had the right to possess the place where the narcotics were found, (12) whether the place in which the narcotics were found was enclosed, (13) whether the accused was found with a large amount of cash, and (14) whether the conduct of the accused indicated a consciousness of guilt. *Evans,* 202 S.W.3d at 162 n. 12. These factors constitute "a shorthand way of expressing what must be proven to establish that [narcotics] were possessed knowingly." *Roberson,* 80 S.W.3d at 735. The number of linking factors present is not as important as the "logical force" they create to prove that an offense was committed. *Id.*

Here, the State relies specifically upon certain factors to link appellant to the cocaine found in the shoe box on the floorboard behind the driver's seat in the van. In our analysis, we examine and evaluate the pertinent factors in light of the links doctrine and in accordance with the legal sufficiency standard of *Jackson. See Evans,* 202 S.W.3d at 161. In its brief, the State contends that the following evidence sufficiently links appellant to the cocaine: (1) appellant, Gordon, and Ayala–Garcia arrived at the motel "in a rented van with North Carolina license plates"; (2) appellant "spent the night of June 14, 2007 and the entire next day with Gordon and Ayala–Garcia, conversing and otherwise exhibiting a significant familiarity with them"; (3) appellant, Gordon, and Ayala–Garcia "spent a notable amount of time waiting at the car wash until the Toyota pulled up in front of the van"; (4) the van, in which appellant was a passen-

ger, "followed the Toyota to a residential neighborhood" without any "visible communication between the driver of the Toyota and the occupants of the van"; (5) appellant "reached into the rear of the van, where their belongings were stored"; (6) appellant "was the passenger in a vehicle in which a very large amount—three kilograms—of cocaine was found"; (7) the cocaine was "conveniently accessible" to appellant; and (8) the cocaine had a very strong chemical smell. In support of its argument that this evidence links appellant to the cocaine, the State relies on *Robinson v. State,* 174 S.W.3d 320 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd), and *Fields v. State,* 932 S.W.2d 97 (Tex. App.-Tyler 1996, pet. ref'd.).

The State's reliance on *Fields* is misplaced. In *Fields,* the Tyler Court of Appeals held that a jury could have found that the evidence linked the defendant, Fields, to cocaine found under the hood of a rented Lincoln Continental Towncar in which he was the front-seat passenger. *Fields,* 932 S.W.2d at 100–04. The Tyler Court of Appeals reasoned that Fields was linked to the cocaine by the following evidence:

(1) inasmuch as the Lincoln had been rented by Fields' [sic] girlfriend, Bostik, Fields had had possession of the vehicle for the preceding five or more days while Fields & Johnson had been in Grand Prairie; (2) the drugs were found concealed beneath the closed hood of the Lincoln, and the hood latch was controlled from the interior of the car; (3) a can of air freshener was located under the seat occupied by Fields, and the air freshener odor matched the scent of the contraband when found; (4) Fields untruthfully denied his prior drug offenses; (5) Fields and Johnson gave conflicting stories as to their purpose for coming to Texas and activities while in Texas; (6) Fields carried an inadequate amount of

clothing for a five day trip; (7) Fields exhibited unnatural equanimity and lack of concern throughout the temporary detention and the subsequent investigation.

*Id.* at 104.

Of the seven links that the Tyler Court of Appeals relied upon, only the first link has any possible similarity to this case, which also involves a rented car. However, the Tyler Court of Appeals did not rely merely on the fact that the defendant was found in a rented car, but rather on the fact that Fields's girlfriend had rented the car, which indicated that Fields "had possession of the vehicle for the preceding five or more days." *Id.* Here, although Officer Williams testified that the van had been rented, there is no evidence that appellant was the individual who had rented the van. The State does not specify how *Fields* supports its argument that the evidence links appellant to the cocaine in this case, but in reviewing the links relied upon in *Fields,* we conclude that *Fields* is inapplicable to the facts in this case. *See id.*

The State also relies on *Robinson* to support its contention that there "were sufficient links between appellant and the contraband to conclude that appellant knowingly possessed the cocaine." In *Robinson,* the defendant was the front-seat passenger in a four-door pickup truck that had been stopped by a police officer. *Robinson,* 174 S.W.3d at 323. The driver did not have a driver's license or any other identification. *Id.* The driver told the police officer that the defendant "should have been driving," but the defendant did not have a driver's license either. *Id.* When he smelled burnt marijuana and discovered a semi-automatic firearm on the floorboard by the defendant's feet, the police officer searched the truck and discovered two kilograms of cocaine hidden in a

compartment built into the back wall of the truck. *Id.* at 323–24. The "logical force" created by the evidence in *Robinson* is absent in the instant case. *See id.* at 326–30; *see also Roberson,* 80 S.W.3d at 735 (requiring that "logical force" of evidence prove that accused committed the offense).

First, in *Robinson,* this Court concluded that the defendant was linked to the cocaine because the cocaine was "conveniently accessible" to the defendant. *Robinson,* 174 S.W.3d at 326. Contraband is "conveniently accessible" when it is "within the close vicinity of the accused and easily accessible while in the vehicle *so as to suggest that the accused had knowledge of the contraband and exercised control over it.*" *Id.* (emphasis added). We reasoned that the defendant had control over the truck and its contents based on evidence that he had keys to the truck, "was supposed to be driving," and had access to the truck for at least two days. *Id.* at 327. Additionally, we noted that the compartment containing the cocaine "was unlocked and unable to be closed completely because a shirt was stuffed in the opening." *Id.* We concluded that this evidence suggested that the defendant had knowledge of and exercised control over the cocaine. *Id.*

Here, the State demonstrated that the cocaine was within reach of appellant, who was seated in the front passenger seat. However, the State did not show that appellant had control over the van or that his proximity to the cocaine suggested that he had knowledge of the contraband and exercised control over it. *Cf. id.* at 326–27. At trial, the State argued that "this cocaine came through the window in a shoebox from the driver of the Toyota." The cocaine was in a closed box and covered by a blanket, and there is no evidence that appellant handled the box or could have

known that the box contained cocaine. Although the box containing the cocaine was found within the close vicinity of appellant, there is no evidence that appellant had knowledge of the contents of the box or exercised control over it. *Cf. id.* at 326. Indeed, the evidence presented by the State linked only Gordon to the box containing the cocaine.

Second, in *Robinson,* we concluded that the defendant was linked to the cocaine because of his and the driver's conflicting statements, which implied "that they were attempting to conceal their activities and to avoid revealing their identities, the ownership of the truck they were driving, and the real reason they had gone to Houston." *Id.* at 328. The State does not rely on, nor do we find in the record, evidence of any such conflicting statements that would link appellant to the cocaine in this case.

Third, in *Robinson* we concluded that the defendant was linked to the cocaine because of several "other factors," i.e., the defendant "had no identification, luggage, toiletry kit, toothbrush, or razor for the purported overnight trip, but he did have a loaded firearm, ostensibly to protect the cocaine." *Id.* at 329. The State does not assert, nor do we find in the record, that any of these "other factors" are present in this case.

Having concluded that neither *Robinson* nor *Fields* supports the State's contention that the evidence sufficiently links appellant to the cocaine in the instant case, we now evaluate the eight factors presented by the State and decide whether the "logical force" they create proves that appellant "possessed" the cocaine. *See Roberson,* 80 S.W.3d at 735.

First, the State asserts that appellant, Gordon, and Ayala–Garcia arrived at the motel "in a rented van with North Carolina license plates," but the State does not explain how this piece of evidence in any way links appellant to the cocaine. There is no evidence that appellant rented or had control of the van. *Cf. Robinson,* 174 S.W.3d at 326–27; *Fields,* 932 S.W.2d at 104. It is undisputed that no one saw appellant drive the van during the two days that it was under surveillance. Evidence that appellant was a passenger "in a rented van with North Carolina license plates" does not, in and of itself, link appellant to the cocaine, which was apparently delivered to Gordon by the driver of the Toyota.

Second, the State asserts that appellant "spent the night of June 14, 2007 and the entire next day with Gordon and Ayala–Garcia, conversing and otherwise exhibiting a significant familiarity with them." Although this evidence links appellant to Gordon and Ayala–Garcia, it does not link him to the cocaine.

Third, the State asserts that appellant, Gordon, and Ayala–Garcia "spent a notable amount of time waiting at the car wash until the Toyota pulled up in front of the van." The driver of the Toyota did deliver a box containing cocaine to Gordon. However, there is no evidence that appellant exercised any control over Gordon or Gordon's driving. There is also no evidence of what was said between Gordon and the driver of the Toyota or that appellant was privy to their conversation. Although the evidence presented links Gordon to the cocaine, it does not similarly link appellant to the cocaine.

Fourth, the State asserts that the van "followed the Toyota to a residential neighborhood" without any "visible communication between the driver of the Toyota and the occupants of the van." Here, as with the third factor, because appellant was merely a passenger in the van while Gordon was following the Toyota, this evidence does not link appellant himself to

the cocaine found in the box behind the driver's seat of the van.

Fifth, the State asserts that appellant had, during Detective Neilon's surveillance, "reached into the rear of the van, where their belongings were stored." Neilon testified that, at one point, he "observed [appellant] at the back of the van with the hatch open." The State does not explain how this links appellant to the cocaine that was later discovered in a closed box on the floorboard in the backseat area of the van. More importantly, when Neilon saw appellant in the back of the van, the driver of the Toyota had not yet delivered the box to Gordon. There is no evidence indicating what, if anything, appellant was reaching for in the rear of the van, and Neilon testified that the three men had their luggage with them in the van. Although evidence about appellant reaching into the rear of the van may link appellant to his luggage, it does not link him to the cocaine.

 Sixth, the State asserts that appellant "was a passenger in a vehicle in which a very large—three kilograms—of cocaine was found." A large amount of contraband may indicate an affirmative link if the "amount of contraband found was large enough to indicate the defendant knew of its existence." *Villegas v. State*, 871 S.W.2d 894, 897 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd) (90 pounds of cocaine and 165 pounds of marijuana found in plain view); *Sosa v. State*, 845 S.W.2d 479, 482–83 (Tex.App.-Houston [1st Dist.] 1993, pet. ref'd) (600 kilograms of cocaine found in truck driven by defendant who had sole and exclusive control over truck); *see also Pollan v. State*, 612 S.W.2d 594, 596 (Tex.Crim.App.1981) (concluding that State proved more than defendant's presence when defendant "moved to the rear of the house" and helped retrieve "large quantity of contraband"). Here, however,

where the package containing three kilograms of cocaine was actually concealed in a closed box delivered to Gordon, the amount of cocaine does not indicate that appellant knew of its existence. *See Roberson*, 80 S.W.3d at 740 (holding that defendant was not linked to 24 grams of cocaine found in pockets of backseat passenger in car and on floorboard of passenger side of car). This is especially so given the fact that the driver of the Toyota handed the box directly to Gordon. Further, even if appellant knew the shoe box contained cocaine, no evidence indicates that appellant directly or indirectly exercised control of the box or in any way aided Gordon in obtaining or exercising control over the box. *See Allen*, 249 S.W.3d at 698–99 ("[O]ne is not a party to joint possession even if she was present and had knowledge of an offense by another.... A defendant's knowledge of the presence of the contraband is insufficient to establish the requisite mental state knowledge of his or her possession of the drugs.").

Seventh, the State asserts that the cocaine was "conveniently accessible" to appellant. However, as noted above, the cocaine was not "conveniently accessible" to appellant because it was not "within the close vicinity of the accused and easily accessible while in the vehicle *so as to suggest that the accused had knowledge of the contraband and exercised control over it.*" *See Robinson*, 174 S.W.3d at 326 (emphasis added). Again, the driver of the Toyota handed the box directly to Gordon, and there is no evidence that appellant exercised control over it.

Finally, the State asserts that the cocaine had a very strong chemical odor. Although Officer Williams did testify that cocaine generally has a very strong, chemical odor, here, there is no evidence that an odor of cocaine was detected in the van.

*See Evans*, 202 S.W.3d at 162 n. 12. PPD Forensic Chemist C. Busby testified that the cocaine was "packaged in plastic tape [and] rubber." None of the police officers testified that they smelled a strong, chemical odor when they searched the van. Absent any evidence that appellant could have smelled an odor of cocaine in the van, testimony that cocaine generally has a strong, chemical odor does not link appellant to the cocaine in this case.

The State's case rests entirely on appellant's presence in the van.[5] Appellant rode as a passenger in a rented van that was driven at all times by Gordon. No evidence indicates that appellant exercised control of the van or over the box that was later found to contain three kilograms of cocaine. In fact, the driver of the Toyota handed the box directly to Gordon, and there is no evidence that appellant aided Gordon in obtaining the box or exercising control over it. The cocaine was not found in plain view where one would immediately know of its presence. Appellant was not under the influence of narcotics. No illegal narcotics of any kind or narcotics paraphernalia was found on his person. There was no odor of cocaine in the van. Appellant was cooperative throughout the stop and made no furtive gestures. He did not engage in conduct indicating a consciousness of guilt and did not attempt to conceal or destroy evidence. Appellant did not attempt to flee or escape and made no incriminating or inconsistent statements connecting himself to the narcotics. The testimony of Officers Williams and Kelly about the typical behavior of narcotics traffickers is probative as to whether they, in their minds, had reasonable suspicion to further detain the men in the van. However, there still remains a lack of the necessary "additional independent facts and circumstances" that link *appellant* to the cocaine. *See Poindexter*, 153 S.W.3d at 406. None of the eight factors upon which the State relies shows that appellant knowingly exercised actual care, custody, control, or management over the cocaine.[6]

5. In *Baldwin*, the defendant was the front seat passenger in a car stopped by a sheriff's deputy for speeding. 2001 WL 1345021, at *3. Before stopping, two white objects were thrown out from the driver's side and the passenger's side of the car. *Id.* at *2. The deputy smelled burning marijuana when he approached the car. *Id.* Subsequently, marijuana was found in concealed compartments built into the front passenger seat and rear seats. *Id.* No evidence indicated that the defendant knew of the compartments. *Id.* at *3. The defendant was not under the influence of marijuana when arrested, and he had no contraband on his person. *Id.* He made no incriminating statements nor did he attempt to flee or otherwise indicate a guilty conscience. *Id.* In reversing the defendant's conviction for possession of a controlled substance, this Court noted that "mere presence, even with knowledge of the crime, will not suffice" to create the required affirmative link to the contraband. *Id.* We held that the evidence was legally insufficient to prove that the defendant exercised care, custody, control, or management of the marijuana. *Id.*

6. In its motion for rehearing, the State contends that the additional following evidence, not mentioned in its brief or at oral argument, links appellant to the cocaine found on the floorboard behind the driver's seat of the van: (1) the expert testimony of narcotics officers that Houston is a major narcotics distribution center and Interstate 10 is a pipeline used by narcotics traffickers; (2) appellant was the only occupant in the van with a significant amount of cash on him; (3) expert testimony that a family reunion invitation and a Bible were typical "props" used by narcotics traffickers to create a cover story; (4) appellant was "working" with the co-defendants to complete a narcotics transaction; (5) the cocaine was very valuable and appellant would not have been "entrusted" with it had he been a mere bystander; and (6) appellant was "not surprised" when he was arrested. It must be noted that the State originally relied on items (1), (2), and (5) to establish appellant acted with intent to deliver the cocaine, not to show that he knew the shoe box contained cocaine or that he exercised care, custody, control or management over the cocaine. Moreover, the

Appellant's presence in a van with a shoe box containing three kilograms of cocaine may be highly suspicious. *Roberson*, 80 S.W.3d at 742. Nevertheless, "possession means more than being where the action is." *Id.* Proof amounting only to a strong suspicion or mere probability will not suffice. *Id.* As in *Roberson*, the State has presented some "potential linking factors" that "might raise suspicion" but which do not have the logical force necessary to actually link appellant to the cocaine. *See id.* The State presented no evidence that appellant voluntarily engaged in conduct demonstrating that he possessed the cocaine found in the shoe box on the floorboard behind the driver's seat in the van. Even when viewed together in the light most favorable to the verdict, the factors relied upon by the State "do not create the logical force necessary to allow a rational juror to find, beyond a reasonable doubt," that appellant exercised knowingly actual care, custody, control, or management over the cocaine.[7] *See id.*

State did not rely on items (3), (4), and (6) in its briefing for any purpose.

Nevertheless, we conclude that the State's reliance on this evidence is misplaced. First, the fact that Houston is a major narcotics distribution center with major highways linking it to the rest of the nation does not link appellant to the cocaine found in the van. Second, although appellant had $637 in his wallet, and this might be considered a "weak" link, the State presented no evidence of appellant's employment status. *See Evans*, 202 S.W.3d at 163. Third, there is no evidence that appellant placed the Bible or the "Wright's and Smith's Annual Family Reunion" invitation in the van, which was, at all times, driven by Gordon. Nor is there any evidence that appellant was asked to offer, or did offer, any explanation at all for his presence in Texas. Fourth, as discussed in detail above, there is no evidence in the record that appellant "worked" with the co-defendants to complete a narcotics transaction. Fifth, there is no evidence that appellant was ever "entrusted" with the shoe box containing the cocaine. Sixth, the State offers no record reference to support its assertion that appellant was "not surprised when he was arrested." More importantly, none of the evidence relied on by the State, considered separately or together, is probative as to whether *appellant* exercised actual care, custody, control, or management over the cocaine or knew that the shoe box found on the floorboard behind the driver's seat in the van contained cocaine. The evidence in the record certainly puts appellant in highly suspicious circumstances; however, the *record before us* simply contains no evidence of *appellant's* possession of the cocaine.

7. In its motion for rehearing, the State, relying on *Evans v. State*, contends that we have erred in viewing the factors on which the State relies in "isolation" and viewing the evidence in "a light most favorable to the defense." The State's reliance on *Evans* is misplaced. In *Evans*, the circumstantial evidence provided the additional independent facts and circumstances necessary to establish the defendant's actual care, custody, control, or management of the cocaine, that is, (1) the defendant was alone in the house where he lived, sitting within arm's reach of fourteen grams of cocaine rocks, which were in plain view "right under his nose"; (2) the defendant immediately admitted that he knew the police were there for "drugs"; and, (3) though apparently unemployed, the defendant had $160 in his pocket. 202 S.W.3d at 163. The record before us here does not contain such evidence.

The State, in its motion for rehearing, also contends that we have found the evidence legally insufficient on the basis of only an "alternative hypothesis." In fact, this Court has thoroughly reviewed all of the evidence expressly relied upon by the State in its briefing and its arguments to this Court to show appellant's *possession* of the cocaine (not his intent to deliver). This Court has also discussed the legal authority expressly relied upon by the State in its briefing and arguments to this Court. The bottom line is that, when viewed in a light most favorable to the verdict, the factors relied on by the State do not establish a link between appellant and the cocaine that generates a reasonable inference that he exercised care, custody, control, or management over it. *See Roberson*, 80 S.W.3d at

### The Law of Parties

Nor is there any evidence that appellant in any way aided or assisted Gordon in obtaining the box containing the cocaine or in exercising control over the box. Again, it is well-settled law that mere presence, even with knowledge of an offense, does not make one a principal or a party to the offense. *Acy,* 618 S.W.2d at 365; *Allen,* 249 S.W.3d at 691. Considering the evidence of what appellant did before, during, and after the cocaine was handed to Gordon, even assuming that appellant knew that the shoe box contained cocaine, there is no evidence that appellant was a participant in the transaction. *See Beier,* 687 S.W.2d at 4. Here, the State proved that appellant rode as a passenger in a rented van from Florida to Texas; stayed the night in a motel and rode to a car wash and clothing store with Gordon and Ayala–Garcia; waited at the car wash in the van with the others for forty to fifty minutes after it had already been washed; rode with the others in the van to a residential neighborhood; talked on his cell phone; walked towards the back of the van at the same time as Gordon and the driver of the Toyota were walking by the side of the van; and sat in the van when the driver of the Toyota handed Gordon the shoe box containing cocaine. Appellant's behavior was essentially passive, not active. The State presented no evidence that appellant voluntarily engaged in conduct demonstrating that he, with the intent to promote or assist Gordon in the commission of the offense of possession of cocaine, did anything to solicit, encourage, direct, aid or attempt to aid Gordon in committing the offense. Viewing the evidence in the light most favorable to the verdict, there is no evidence that appellant was a party to Gordon's possession of the cocaine.

735. In sum, the State presented no such

### Conclusion

Accordingly, we hold that the evidence is legally insufficient to support appellant's conviction of the offense of possession of a controlled substance.

We sustain appellant's first point of error. Having held that the evidence is legally insufficient, we need not address appellant's second and third points of error.

We reverse the judgment of the trial court and render a judgment of acquittal.

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

I respectfully dissent. I would hold that the evidence was legally and factually sufficient to establish affirmative links showing that appellant exercised "care, custody, control or management" over the cocaine at issue in this case. Therefore, I would overrule appellant's first issue rather than reversing and rendering judgment acquitting him.

### Facts

To obtain a conviction of a defendant for possession of contraband with intent to deliver, under Chapter 481 of the Texas Health and Safety Code, as here, the State must prove that the defendant had "possession" of the contraband, i.e., exercised "actual care, custody, control, or management." This case deals with the standard of review of the affirmative links required by Texas law to establish the "actual care, custody, control, or management" of controlled substances by professionals engaged in large-scale drug opera-

evidence in the trial below.

tions.[1] Because I believe the testimony of drug enforcement agents as to the characteristic behavior of professional drug operatives and the circumstances under which a defendant in such a case is apprehended is material to the logical force of the affirmative links between the defendant and the controlled substance, I would state the material facts of this case differently from the majority, and I would give weight to evidence the majority disregards and much less weight to evidence the majority credits as material to its analysis.

Here, among the officers who testified was Pasadena Police Department ("PPD") Officer W.R. Kelly. Officer Kelly testified to his 17 years experience as a narcotics officer doing investigation and undercover work, primarily pricing narcotics. He testified that Houston is a major distribution center for narcotics due to the intersections of "major interstates that you can get it into through the port system." He further testified that a typical kilo of cocaine costs $100,000 on the street in Houston and would not be for personal use and that the three kilos found in the van in which appellant was a front seat passenger was a large amount of cocaine.

Officer Kelly testified that he was part of the team that investigated appellant and two other men on June 14–15, 2007. While he was conducting surveillance at a Super 8 Motel on June 14, 2007, he saw three men, including appellant, arrive in a Chrysler mini-van with North Carolina plates after 9:00 p.m. and check into the motel for the night. Their behavior was typical of persons here to make a narcotics transaction. Specifically, Officer Kelly testified that in a typical narcotics transaction he looks for certain characteristics, including "[o]ut of state cars, people paying by cash, a lot of foot traffic in and out of the rooms." Characteristics of dealers are that they are "constantly moving about" and "on cell phones in and amongst each other." They are "coming and going from rooms, going to different parts of town, always on the phone, continuing looking around as though they might be waiting for something." Here, appellant and the other two men were friends; they did not separate much; "whenever they were on the phone, they were in among each other on the phone." Officer Kelly left the motel when it became apparent that no transaction was to take place that night, but the next day, June 15, he followed the van when it left the motel and continued his surveillance throughout the day. Appellant was the front seat passenger.

Detective T. Neilon of the PPD testified that he had been in narcotics investigation for just under two years, had attended a number of narcotics and weapons schools, and had done numerous surveys. On June 14, 2007, he was at the Super 8 Motel and conducted surveillance on a crossover SUV-type van with North Carolina plates. He checked the van's license plate and found it had been rented in St. Petersburg, Florida. None of the occupants was the owner. Detective Neilon testified that he continued surveillance the next morning and saw the men come out of the motel, load the van together, and check out. They then got in the car, with one man in the back seat and appellant as the front seat passenger. They entered Interstate I–10 (I–10) West towards downtown Houston, exited around the Yellowstone and Old Spanish Trail exit off of Highway 288, and went to a tire shop. They milled around talking on cell phones while they had a tire repaired. They then drove to a car wash, where all three got out of the car, approached a group of men who appeared to

---

1. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.002(38) (defining "possession"), 481.112(a), (f) (defining offense and establishing penalty) (Vernon Supp. 2009).

be loitering around, and appeared to give them money. The men then spent about 45 minutes washing the car and talking on their cell phones, after which they pulled the van into a stall, unloaded it completely, and vacuumed it, staying close to their luggage. After vacuuming the van, they reloaded the luggage and drove to an End Zone store, entered, and came back to the van about 25 minutes later without appearing to have bought anything.

The men then returned to the car wash, parked the van in one of the stalls as rain began to fall, and waited inside the van. After forty or fifty minutes, they pulled out. A green Toyota Camry pulled up directly in front of the van, stopped in traffic, and then began rolling. The van pulled out onto Old Spanish Trail, and the two vehicles proceeded together through traffic onto Loop 610, "bumper locking" and staying less than a car length apart. They exited the South Loop of 610 onto Yosemite. The Toyota then stopped in front of the van, and Detective Nielon, who was following on a parallel street, saw the driver of the Toyota walk back towards the van. Appellant was at the back of the van with the hatch open reaching in with both arms. Detective Nielon then lost sight of the van. When contact was reinstated, the van was facing in the opposite direction, almost directly across the street from the initial stop. It remained parked there for 15–20 minutes. Nielon then moved away. When he came back, the Toyota was pulling out onto Crestmont with the van directly behind it again. Detective Nielon lost them but found them again eastbound on Loop 610, driving erratically and getting on and off the freeway.

After Detective Neilon called for additional surveillance, a marked patrol unit stopped the van at Allen Genoa and Highway 225. The occupants were already out of the van when Detective Neilon arrived.

Three kilos of cocaine were found in a shoebox with a flip-top lid wrapped in a blanket on the floorboard behind the front passenger seat. The wrapping was "what we come into contact with the wrapping from shipping from generally South Texas up to Houston." The cell phones were on the gear shift and in the back passenger seat. Detective Nielon testified that the behavior he observed was consistent with narcotics transactions. He testified that three kilos of cocaine were found in the shoebox and that this was a "very large amount of cocaine" worth "a lot of money."

Officer C. Scott, a PPD police officer temporarily assigned to the narcotics narcotics division for the night shift patrol and also assigned to patrol duty, testified that he was in a marked patrol vehicle that was called to aid in the surveillance about 4:00 p.m. on July 15. He caught up with the van as it was traveling eastbound on Loop 610 and stopped it for changing lanes without signaling and for failing to yield. The driving was very erratic and unsafe. Officer Scott instituted his lights and signals when he thought it safe and stopped the van off the freeway at a service station. He asked the passengers to step out, and they cooperated. The cocaine was in a shoebox with a flip-type lid under a blanket within arm's reach of the backseat passenger.

Officer C.D. Williams, likewise a PPD officer, testified that he was just starting his second two-year tour in the narcotics division after 25 years in the department. He was also on the scene during the surveillance and ultimately during the arrest and had the responsibility to collect evidence. He testified that items found in the van included an invitation to "Wright's and Smith's Annual Family Reunion," undated and with no address, and a Bible placed on the dashboard where it could be seen through the window and that both

items were typical of drug dealers seeking a cover story. The only person in the van with any significant money at the time of the stop was appellant, who had $600. All of the occupants of the van said they were from St. Petersburg. Officer Williams further testified that it is common for narcotics officers to work I–10 east regarding narcotics activity because it is consider a "pipeline for both money and drugs going east and west coast to coast."

## Discussion

The majority acknowledges that the State relies on *Robinson v. State*, 174 S.W.3d 320 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd), and *Fields v. State*, 932 S.W.2d 97 (Tex.App.-Tyler 1996, pet. ref'd.), to support its argument that the evidence in the case established affirmative links between the cocaine and appellant. *Blackman v. State*, No. 01–08–00138–CR, Op. at 15 (Tex.App.-Houston [1st Dist.] 2009). However, after surveying the affirmative links relied upon in *Fields* to support a finding that the appellant exercised "care, custody, control or management," over the cocaine, the majority concludes that "[o]f the seven links that the Tyler Court of Appeals relied upon, only the first link has any possible similarity to this case, which also involves a rented vehicle." *Id.* at 11. The majority also surveys the factors used to establish care, custody, control, or management in *Robinson* and concludes that "the 'logical force' created by the evidence in *Robinson* is absent in the instant case." *Id.* at 12 (citing *Robinson*, 174 S.W.3d at 326–30).

I disagree with the majority's application of the standard of review, its analysis of *Robinson* and *Fields*, and its conclusion that these cases do not support a finding of affirmative links in this case. I would hold that the evidence was both legally and factually sufficient to establish appellant's

"care, custody, management, or control" over the cocaine in this case under the standard of review as set out in *Fields* and *Robinson*, as well as in the Court of Criminal Appeals cases, *Evans v. State*, 202 S.W.3d 158 (Tex.Crim.App.2006), and *Poindexter v. State*, 153 S.W.3d 402 (Tex. Crim.App.2005).

In *Robinson*, this Court pointed out that the State need not prove the accused's exclusive possession of contraband to convict him as a principal, but when the accused is not in exclusive possession of the place where the contraband is found the State must establish an "affirmative link" between the accused and the contraband through independent facts that suggest that the accused had knowledge of the contraband and exercised control over it. 174 S.W.3d at 325. An affirmative link may be established by either direct or indirect evidence. *Id.*

In *Robinson*, a Department of Public Safety (DPS) trooper pulled over the truck in which Robinson, the defendant, was the front seat passenger for following another vehicle too closely while traveling east on I–10 just outside of Houston. *Id.* at 323. The driver, who could not produce identification, told the police that he and Robinson had been in Houston for four days to see a friend and had been staying at a Super 8 Motel and that no one else had come with them. *Id.* Robinson, who likewise carried no identification, stated that they had been in Houston for two days and that they had driven his cousin to Houston, but he could not name the cousin. *Id.* The officer smelled marijuana and noticed the magazine for a semi-automatic weapon in the truck console's cupholder. *Id.* He asked Robinson where he could find the weapon. *Id.* When Robinson reached down to the floorboard, the officer grabbed him and ordered him out of the truck. *Id.* at 323–24. He then found a semi-automat-

ic handgun under a shirt on the floorboard where Robinson had reached. *Id.* at 324. Upon searching the truck, he found two large, vacuum-sealed packages in a factory compartment built into the back wall of the truck, which he cut into, finding cocaine. *Id.* At trial, a DPS officer testified that the amount of cocaine found, two kilos, was too large for personal use and was possessed with the intent to deliver. *Id.* He further testified that Houston is a major distribution center for cocaine, cocaine is usually transported by vehicle, and I–10 is a major highway running between Houston and Gulfport, Mississippi, where the registered owner of the truck lived. *Id.*

In *Robinson*, the State argued that several factors affirmatively linked the defendant to the cocaine, specifically: "(1) the cocaine was conveniently accessible to appellant; (2) the cocaine was found in an enclosed space; (3) there was a strong odor of marijuana in the truck; and (4) appellant and the driver of the truck gave conflicting statements to [the police]." *Id.* at 326. This court agreed. *Id.* at 326–29. We concluded that the admission of the driver that he had stayed in a Houston motel with Robinson for at least two days after arriving in a borrowed truck that turned out to be registered in Mississippi, the discovery of the cocaine in a factory compartment that could be seen and accessed only by folding down the truck's back seat, the fact that the driver and Robinson both had keys to the truck, and the driver's statement that Robinson was supposed to be driving "taken together, offer strong support for the conclusion that [Robinson] had control over the truck and its contents and that the cocaine was within the vicinity of and easily accessible to appellant." *Id.* at 327. We also concluded that "the location of the cocaine in an enclosed space helps to establish the requisite affirmative link between appellant and the cocaine," as did the driver's

and Robinson's conflicting statements. *Id.* at 327. In addition, we considered the large amount of contraband found in the truck, namely two kilos of cocaine with a high street value and found the amount "strongly indicative of an affirmative link between it and [Robinson]." *Id.* at 328–29.

In *Fields*, a DPS trooper stopped a Lincoln Continental Towncar for driving at a high rate of speed on Interstate 30 (I–30). 932 S.W.2d at 100. The car had an Avis rental sticker. *Id.* at 100–01. The driver was unable to produce personal identification when asked for it, although he conducted a cursory search of the glove compartment and the trunk, rifling nervously through the contents without finding anything. *See id.* at 101. The defendant, Fields, who was a passenger in the car, produced a Tennessee driver's license that turned out to be suspended. *Id.* He stated that his girlfriend had rented the Lincoln for them. *Id.* The officer placed Fields under arrest for driving with a suspended license and, suspecting drugs were being transported in the car, called for backup. *Id.* The driver and Fields gave conflicting stories as to where they had been, the driver testifying that they had been in Grand Prairie for five days helping his uncle level a house and Fields stating that they had been in Grand Prairie looking for a site for his home. *Id.* Fields attempted to show the officer a set of plans. *Id.* When back-up support arrived, the officer informed Fields and the driver that he suspected they were carrying drugs. *Id.* The car was transported to the Hopkins County Sheriff's Office, where drugs were found by troopers in a bag under the hood of the Lincoln. *Id.* Air freshener, beepers, and luggage were also found in the car. *Id.* at 102.

The Tyler Court of Appeals held that Fields was linked to the contraband by a number of factors, including the fact that

the Lincoln had been rented by Fields' girlfriend; he and the driver had had possession of the vehicle for the preceding five days or more while they had been in Grand Prairie; the drugs were found concealed beneath the closed hood of the Lincoln, and the hood latch was controlled from inside the car; a can of air freshener was located under the seat occupied by Fields and matched the odor of the contraband when found; Fields untruthfully denied prior drug offenses; Fields and the driver gave conflicting stories regarding their purpose for coming to Texas and their activities in Texas; Fields carried inadequate clothing for a five day trip; and he "exhibited unnatural equanimity and lack of concern" when detained and throughout the investigation. *Id.* at 104.

The court held that testimony by a narcotics expert regarding drug trafficker patterns and characteristics was also relevant to the issue of the defendant's knowledge that cocaine was present under the hood of the car in which he was a passenger. 932 S.W.2d at 108. Testimony as to the wholesale and $900,000 street values of the 6.6 pounds of cocaine found was also relevant to the issue of the parties' knowledge that the drug was present under the hood. *Id.* The court concluded that the jury could also have found that the presence of drugs in an automobile under the circumstances was often the result of team work and thus tended to negate the possibility that either defendant was unaware of the contraband's presence under the hood. *Id.*

In my view, *Fields* and *Robinson* are virtually identical to the instant case. The same type of factors relied on to establish affirmative links between the appellant and the controlled substance are present in this case and should be weighted similarly in our review of the evidence. This conclusion is further strengthened by the instructions for applying the standard of review given the intermediate appellate courts by the Court of Criminal Appeals in *Poindexter*, 153 S.W.3d 402, and *Evans*, 202 S.W.3d 158.

In *Poindexter*, the Court of Criminal Appeals observed that, in deciding whether evidence is sufficient to link a defendant to contraband, as required to support his conviction for possession of a controlled substance, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. 153 S.W.3d at 406. "Thus, once the trier of fact has weighed the probative value of . . . evidence in its fact finding process, an appellate court cannot deny that evidence probative value or ignore it in its review of the sufficiency of the evidence." *Id.* The appellate court may determine only whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt on the basis of all of the evidence admitted at trial. *Id.* at 406–07. The court pointed out that a person, including a friend, as in this case, may jointly possess the place where contraband is found but not necessarily jointly possess the contraband found in that place unless additional independent facts and circumstances affirmatively link him to the contraband. *Id.* at 406. An affirmative link can be established, however, when the contraband is in plain view or is hidden in a place tied to the accused. *Id.* at 409 n. 24.

In *Poindexter*, the Court of Criminal Appeals disagreed with the court of appeals that the evidence was insufficient to establish affirmative links between the defendant, Poindexter and the crack cocaine at issue. *Id.* at 405. The court of appeals had concluded that because there was some evidence indicating that another person was present in the house when a confidential informant (C.I.) bought cocaine, the State had failed to prove possession of the

house. *Id.* The court of appeals had also found the links between the defendant and the drugs and drug distribution materials found in the house insufficient to justify a rational trier of fact in finding the evidence legally sufficient to support the defendant's conviction. *Id.*

Reversing after setting out the standard of review, the Court of Criminal Appeals observed that the appellate court had "declined to consider the probative value of the C.I.'s unobjected-to out-of-court statements that appellant possessed cocaine, sold cocaine, and hid the cocaine in an open hall closet." *Id.* The Court of Criminal Appeals also stated that it "defies logic," when a narcotics officer has found crack cocaine hidden in the ceiling of a house where a confidential informant had told him the defendant kept his crack cocaine to conclude that the State's evidence linked the defendant to the house but did not "establish that he knew of the secret stash of drugs hidden in the ceiling." *Id.* at 410.

Similarly, the majority in the instant case ignores evidence that, in my view, is highly probative of appellant's affirmative links to the three kilos of cocaine found in the shoe box on the floor of the van behind his seat, including evidence that the shoebox was transferred into the van in which appellant and two other men had traveled together from St. Petersburg, Florida to a Motel 8 on I–10 in Houston, along a known drug route, and that appellant had remained with the other men all day, loitering in and around the van, talking on cell phones, and otherwise engaging in behavior characteristic of drug operatives, at one point loading, unloading, vacuuming, and reloading the van, until contact was made with a green Toyota. The two vehicles then traveled together to a location where appellant was seen opening the back hatch of the van, after which the van was again seen by officers conducting surveillance as it left that location and was stopped after driving erratically on and off the freeway, and the shoebox was found under a blanket behind appellant's seat within arm's reach.

In *Evans,* the Court of Criminal Appeals chastised the court of appeals for analyzing each of the facts or links in isolation and, "[a]pparently relying on alternative inferences from or explanations for almost every piece of evidence, . . . disregard[ing] that evidence and conclud[ing] that nothing but appellant's presence and proximity linked him to the drugs." 202 S.W.3d at 164. The *Evans* court observed that "it is not the number of links between the defendant and the drug that is dispositive but, rather, the logical force of all of the evidence, direct and circumstantial," and it went on to state that "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.* at 163 (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). The court stated:

> The State argues that the single most important link or connection between appellant and the fourteen grams of cocaine rocks is the simple fact that he was sitting directly in front of them. They were within arm's reach; the coffee table was less than a foot away. This evidence constitutes two extremely strong "presence" and "proximity" links. Appellant was not merely present in a house with drugs cached away somewhere, they were right under his nose. The drugs were in plain view—a third link. He was alone in the house—a fourth link. He immediately admitted that he knew why the police had walked in the door—"Drugs." That is a fifth link. He received mail at 923 Lombrano, thus raising a reasonable inference

that he lived there, which, in turn raises a reasonable inference that he had actual care, custody, and control of items found in plain view on the coffee table. This is a sixth link. He had $160 in twenties in his pocket, but he was apparently unemployed. This is a seventh, albeit weak, link. The State argues that the sum total of this circumstantial evidence is sufficient to support a rational jury's finding, beyond a reasonable doubt, that appellant exercised actual care, custody, control, or management of the fourteen grams of cocaine on the coffee table. We agree.

*Id.* The majority's approach to the instant case is, in my view, exactly like that of the court of appeals which the Court of Criminal Appeals specifically disapproved of in *Evans.*

I would hold that, under the criteria set out in *Evans, Poindexter, Fields,* and *Robinson,* the evidence in this case was both legally and factually sufficient to establish appellant's possession of the cocaine at issue. Here, as in *Fields,* there was testimony by a narcotics expert regarding drug trafficker patterns and characteristics, which I would find relevant to the issue of appellant's "care, custody, or control" over the cocaine present in the shoe box placed on the floorboard behind his seat in the car in which he was a passenger and which had not been there when appellant and the other two men had loaded luggage into the van, unloaded and vacuumed it and reloaded it, but was there when the van was stopped by officers after being parked beside the green Toyota it had followed.

There was testimony here, as in *Fields* and *Robinson,* that Houston is a major drug distribution center and that I–10 is a route used by drug traffickers. *Cf. Robinson,* 174 S.W.3d at 324. The experienced narcotics officers who conducted the surveillance and arrest of appellant and the other occupants of the van identified numerous indicia of narcotics trafficking in the behavior of appellant and the others. *Cf. Fields,* 932 S.W.2d at 108 (referencing "team work" as characteristic of narcotics traffickers). Appellant and his two companions arrived at the motel "in a rented van with North Carolina license plates." Appellant spent the night of June 14, 2007 and the entire next day with his two companions in the motel and in and around the van, talking on cell phones. They "spent a notable amount of time waiting at the car wash until the Toyota pulled up in front of the van." The van followed the Toyota sedan at a bumper-to-bumper distance for a long distance into a residential neighbor where the two vehicles stopped, the driver of the Toyota delivered a box to the van, and appellant was seen by Detective Neilon at the back hatch reaching into the van. The van and the Toyota stayed in the same neighborhood for a significant period of time, then left together, driving erratically and getting on and off the freeway, in a pattern Detective Neilon testified was characteristic of drug traffickers and Officer Scott testified was unsafe. *Cf. Robinson,* 174 S.W.3d at 323 (stopping vehicle for traveling too close). The cell phones officers had observed the van passengers using frequently all day were found in the van. *Cf. Fields,* 932 S.W.2d at 102.

As in both *Robinson* and *Fields,* a very large amount of cocaine, too great for personal use, namely three kilograms with a street value of approximately $300,000, was found in the van when it was stopped by officers and its occupants ordered out. *See Robinson,* 174 S.W.3d at 328–29 (two kilos of cocaine); *Fields,* 932 S.W.2d at 108 (6.6 pounds of cocaine). Moreover, the cocaine was found hidden in an enclosed space and the amount of cocaine indicated that it would not be used for personal use.

*Cf. Robinson,* 174 S.W.3d at 327–29; *Fields,* 932 S.W.2d at 102, 104.

The cocaine was also "conveniently accessible" to appellant in that it was "within the close vicinity of the accused and easily accessible while in the vehicle so as to suggest that the accused had knowledge of the contraband and exercised control over it." *Cf. Robinson,* 174 S.W.3d at 326; *Fields,* 932 S.W.2d at 104. Specifically, the cocaine was within arm's reach of the back seat passenger behind the front passenger seat in which appellant was seated. *Cf. Robinson,* 174 S.W.3d at 326–27 (finding link where container in which cocaine was located "was unlocked and unable to be closed completely because a shirt was stuffed in the opening"); *Fields,* 932 S.W.2d at 104 (finding link where drugs were found concealed beneath closed hood of care whose hood latch was controlled from interior).

Appellant had control over the van and its contents based on evidence that he had arrived in the van from St. Petersburg with the two other occupants, none of whom owned the rented vehicle, had access to the van during the entire time it was surveyed, and had loaded and unloaded the van with the other occupants and occupied it the entire day of the surveillance and arrest. *Cf. Robinson,* 174 S.W.3d at 327; *Fields,* 932 S.W.2d at 101, 104.

Additionally, the Bible, which contained the name of an unknown person, and the undated invitation to a family reunion with no identifying date or address, as well as the rented van with untraceable ownership suggested to officers familiar with narcotics trafficking that appellant and the other occupants of the van were, as in *Robinson,* "attempting to conceal their activities and to avoid revealing their identities, the ownership of the [vehicle] they were driving, and the real reason they had gone to Houston." 174 S.W.3d at 328; *cf. Fields,* 932 S.W.2d at 101, 104.

For the foregoing reasons, I would hold that the evidence is legally and factually sufficient to establish appellant's "care, custody, management, or control" over the three kilos of cocaine found behind his seat in the van in which he was traveling. I would, therefore, overrule appellant's first issue and address his *Batson* issue.